# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO.03-03-00577-CV

**Trilogy Software, Inc., Appellant**

**v.**

**Callidus Software, Inc. and Yinghui Liu, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT NO. GN-300650, HONORABLE PAUL DAVIS, JUDGE PRESIDING

## O P I N I O N

This is an intellectual property case that arose after appellee Yinghui Liu, who formerly worked for appellant Trilogy Software, Inc., went to work for appellee Callidus Software, Inc., one of Trilogy's competitors. Trilogy filed a lawsuit alleging that Liu breached non-competition and non-disclosure agreements with Trilogy and that Callidus tortiously interfered with those agreements. Trilogy also alleged that both Callidus and Liu misappropriated Trilogy's trade secrets. The trial court granted summary judgment in favor of Callidus and Liu as to all of Trilogy's claims. We affirm in part and reverse and remand in part.

# BACKGROUND

Trilogy, a software company, hired Liu, a computer programmer, in 1999. On his first day of work, Trilogy asked Liu to sign a Proprietary Information Agreement (PIA). The agreement was prefaced with the clause, "In connection with my employment by Trilogy Software, Inc., I agree to the following," followed by sixteen numbered paragraphs. Paragraph one set forth several prohibitions against Liu's use or disclosure of Trilogy's proprietary information (hereinafter, the "non-disclosure agreement"):

> Proprietary Information. I understand that my work as an employee of Trilogy will involve access to and creation of confidential (including trade secrets) and proprietary information (collectively "Proprietary Information"). I agree to keep all Proprietary Information in trust for the benefit of Trilogy. I will never use any Proprietary Information, except as required by my duties to Trilogy. I understand that this prohibition prevents me from discussing Proprietary Information, even in general terms, with persons outside Trilogy.
>
> "Proprietary Information" means information, ideas, and materials of or about Trilogy or its affiliates, employees, customers or others with whom Trilogy conducts business. Proprietary Information that is not generally known to the software industry or the public is confidential and I agree to exercise diligence at all times to maintain the confidentiality of all confidential Proprietary Information and not disclose confidential Proprietary Information. I understand that my obligation to keep Proprietary Information strictly confidential shall survive the termination of my employment and/or this agreement.
>
> Proprietary Information includes, without limitation, information, ideas or material of a technical nature such as research and development results, software design and specifications, source and object code, training and training materials, invention disclosures, patent applications and other materials and concepts relating to Trilogy's products and processes. Proprietary Information also includes information, ideas, or materials of a business nature such as non-public financial information; information relating to profits, costs, marketing, strategy, purchasing, sales, customers, suppliers, contract terms, employees, and salaries, product development plans; business and financial plans and forecasts, and marketing and sales plans and forecasts.

2

Paragraph four of the PIA set forth various restrictions against Liu competing with Trilogy (hereinafter, the "non-compete agreement"):

> Competing Business. . . . In consideration of Trilogy's agreement to provide such Proprietary Information and such specialized training to me and my receipt of such Proprietary Information and training, and in the recognition of the value of such Proprietary Information and training to Trilogy, I agree that I will not, during and for a period of 24 months (if terminated without cause, then for a period of 12 months) following termination of my employment by Trilogy . . . [or] on my own behalf . . . engage in or render services to any person or entity engaged in any business in which Trilogy . . . is engaged, in any county or parish of any state in the United States or in any country or political subdivision of the world in which Trilogy . . . conducts such business.
>
> . . .

Other provisions of note included paragraph five, which required Liu to immediately return all property belonging to Trilogy and all material containing Proprietary Information upon termination of his employment or "at any time it so requests." Finally, paragraph fifteen provided:

> General. This is not an employment contract. Unless otherwise provided in an Employment Agreement between you and Trilogy, I understand that my employment is "at will" and nothing set forth in this Agreement shall prevent or limit my right to terminate my employment any time with or without notice, and Trilogy may terminate my employment at any time and for any reason without notice.

Liu signed the agreement on November 15, 1999. The PIA did not contain a blank in which a Trilogy representative could sign the agreement, and no one from Trilogy signed it. It is undisputed that later that same day, Trilogy gave Liu access to Proprietary Information and training.

3

While at Trilogy, Liu worked as a technical consultant who customized versions of a Trilogy data management software product, DMS, for use by various insurance companies. One of those insurance companies was Aetna. Liu's work involved customizing a version of DMS to address Aetna's unique business needs relating to its agent compensation system.[1] This task required Liu to both write new software and to identify functionality within the then-existing versions of DMS that could satisfy the requirements. Liu also developed a project plan to move certain aspects of Aetna's compensation scheme to a more advanced version of DMS. Liu was the primary contact for Aetna with regard to the technical aspects of Trilogy's work.

In December 2002, Callidus contacted Liu to inquire about the possibility of him working for Callidus. Although Liu responded by e-mailing a resume and discussing the opportunity, Liu told Callidus that he was not interested in leaving Trilogy. On January 17, 2003, however, Trilogy informed Liu that he would be laid off due to lack of work, and did so on January 21, 2003, although Liu remained on the payroll until February 21. Trilogy prepared an "Employment Separation Agreement" (ESA) wherein it provided Liu with one month salary and allowed him to remain on the payroll for that month in the interest of preserving Liu's immigration status. The Agreement also provided: "You agree to continue to comply with the terms of any non-competition and non-disclosure/confidentiality agreement . . . ." The original PIA was stapled to the back of the Separation Agreement. Liu signed the ESA on February 10, 2003.

---

[1] Because much of the specific technological and proprietary information at issue in this case has been filed under seal, our references are deliberately vague to preserve confidentiality.

4

Upon being notified that he would be laid off, Liu sent out his resume to a number of companies, including Callidus, Aetna, and Accenture, which provided consulting services to Aetna. Callidus hired him in early February 2003. Callidus is a software company offering compensation management software, TrueComp, that competed with Trilogy's DMS. The summary judgment record indicates that Callidus was attracted to Liu because of his "formidable technical and domain strengths" and hired him with an eye to deploy him in the company's effort to win Aetna's business.

Having learned of Callidus's employment of Liu, Trilogy filed this suit on February 28, 2003. It asserted the following claims against Liu:

- Breach of his non-disclosure agreement with Trilogy;

- Breach of his non-compete agreement with Trilogy;

- Misappropriation and "inevitable disclosure" of Trilogy's trade secrets.

Against Callidus, Trilogy asserted the following claims:

- Tortious interference with Trilogy's contractual rights under its confidentiality and non-compete agreements with Liu;

- Misappropriation and "inevitable disclosure" of Trilogy's trade secrets.

Trilogy sought both damages and injunctive relief, as well as expedited discovery. On the same day, the district court issued a temporary restraining order prohibiting Liu and Callidus from using or disclosing Trilogy trade secrets or confidential information, soliciting certain customers of Trilogy,

5

or destroying any information relating to Trilogy trade secrets, confidential information, or Trilogy products. However, the court refused to enforce the non-compete agreement. This temporary restraining order was later extended by agreement of the parties.

In March of 2003, Callidus won the Aetna account from Trilogy, and the "Aetna project" whereby Callidus was to implement software to manage Aetna's agent compensation system was scheduled to begin in mid-April. Although there is no evidence that Liu was involved in the sales effort to win this account, a team from Accenture involved with the planning for the project requested his assistance. One of the Accenture employees on the project was Saied Karamooz, the same Accenture consultant with whom Liu had worked on Aetna matters while at Trilogy.

Liu explained in his deposition that the team drew "a very clear line" whereby he would not be asked to divulge "anything which has anything to do with Trilogy software implementation." However, on March 10, Liu received an e-mail from one of the Accenture employees on the team with roughly fifty files attached. The e-mail requested Liu to "[t]ake a look at the attached files for some background on the project and on the ETL [extraction, transformation and loading] portion specifically." Trilogy asserts that several of these files contained its trade secret information, including a spreadsheet that described the data model that Trilogy used in its DMS product.

In early April, Liu advised the Accenture team members, and later Callidus top management, of various issues relating to the complexities of Aetna's business systems that Liu felt were not adequately addressed by the TrueComp product. This triggered additional work by Callidus personnel to address those issues.

6

Liu was deposed on April 8, 2003. As of that time, he had not worked directly with Aetna personnel, but only with Accenture or Callidus employees. He described his job at Callidus as "deploy[ing] Callidus's software to an enterprise environment," which entailed understanding customer needs and how Callidus's software can best address those needs. He denied that he would be involved in pre-selling activities or in writing source code to customize Callidus products to customer needs.

On May 6 and 7, 2003, Callidus and Liu each filed a motion for summary judgment as to all of Trilogy's claims. A hearing was held on May 28 before the Honorable Paul Davis. Judge Davis granted both motions at the conclusion of the hearing and signed an order to that effect on August 18. Trilogy now appeals.

**ANALYSIS**

Trilogy asserts that the district court erred by granting summary judgment against each of its claims. It presents six issues whose controlling legal questions can be grouped as follows: (1) whether the non-compete agreement between Liu and Trilogy is enforceable;[2] (2) whether the evidence raises a fact issue as to whether Liu and Callidus have misappropriated Trilogy's trade

---

[2] This question controls our disposition of Trilogy's first and second issues. In its first issue, Trilogy complains that the trial court erred in granting summary judgment on its claim that Liu breached the non-compete agreement. In its second issue, Trilogy complains of the trial court's summary judgment on its claim that Callidus tortiously interfered with the non-compete agreement. Both issues turn on the enforceability of the non-compete obligations in the PIA and ESA. *See Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 665 (Tex. 1990) (tortious interference claim cannot be predicated upon unenforceable non-compete clause).

7

secrets, or inevitably will;[3] and (3) whether the trial court properly granted summary judgment as to Trilogy's claims that Liu breached his contractual non-disclosure obligations and that Callidus tortiously interfered with those obligations.[4]

**Standard of review**

Liu and Callidus each moved for summary judgment under both the traditional and no-evidence standards.[5]

*Traditional summary judgment*

The standards for review of a traditional summary judgment are well established: the movant must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law; in deciding whether there is a disputed material fact issue precluding summary judgment, the court must take evidence favorable to the nonmovant as true; and the court must indulge every reasonable inference in favor of the nonmovant and resolve any doubts in the nonmovant's favor. *See* Tex. R. Civ. P. 166a(c); *Pustejovsky v. Rapid-Am. Corp.*, 35 S.W.3d 643, 645-46 (Tex. 2000); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985).

---

[3] In issues five and six, Trilogy complains that the trial court erred in granting summary judgment on Trilogy's trade secret misappropriation claims against Liu and Callidus, respectively.

[4] Issue three urges that the trial court erred in granting summary judgment on Trilogy's claim that Liu breached the non-disclosure agreement, while issue four complains of summary judgment on Trilogy's claim that Callidus tortiously interfered with that agreement.

[5] *See Binur v. Jacobo*, No. 02-0405, 2004 WL 1048332, *3 (Tex. May 7, 2004).

8

*No-evidence summary judgment*

A party seeking a no-evidence summary judgment must assert that no evidence exists as to one or more of the essential elements of the nonmovant's claims on which it would have the burden of proof at trial. *Holmstrom v. Lee*, 26 S.W.3d 526, 530 (Tex. App.—Austin 2000, no pet.). Once the movant specifies the elements on which there is no evidence, the burden shifts to the nonmovant to raise a fact issue on the challenged elements. Tex. R. Civ. P. 166a(i). To raise a genuine issue of material fact, the nonmovant must set forth more than a scintilla of probative evidence as to an essential element of the nonmovant's claim on which the nonmovant would have the burden of proof at trial. *See id.*; *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). If the evidence supporting a finding rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions, then more than a scintilla of evidence exists. *Havner*, 953 S.W.2d at 711. Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of fact, and the legal effect is that there is no evidence. *Jackson v. Fiesta Mart*, 979 S.W.2d 68, 70 (Tex. App.—Austin 1998, no pet.) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). If the nonmovant fails to present evidence raising a genuine issue of material fact as to the challenged element, the trial court must grant the motion. Tex. R. Civ. P. 166a(i). A no-evidence summary judgment is essentially a directed verdict granted before trial, to which we apply a legal sufficiency standard of review. *Jackson*, 979 S.W.2d at 70.

The district court did not state the basis for its decision in either of its orders granting summary judgment. When we review a summary judgment in which the trial court did not state the

9

basis for its decision in its order, the appealing party must show that it is error to base summary judgment on any ground asserted in the motion. *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995). We must affirm the summary judgment if any one of the movant's theories has merit. *Id.* Because the propriety of a summary judgment is a question of law, we review the trial court's decision *de novo*. *See Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994).

**Enforceability of the non-compete agreement**

The enforceability of a covenant not to compete is a question of law. *Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 644 (Tex. 1994); *Alex Sheshunoff Mgt. Srv., L.P. v. Johnson*, 124 S.W.3d 678, 684 (Tex. App.—Austin 2003, pet. filed). A covenant not to compete is a disfavored contract in restraint of trade and is unenforceable unless it meets certain statutory requirements. *See* Tex. Bus. & Com. Code Ann. §§ 15.05, .50 (West 2002); *Sheshunoff*, 124 S.W.3d at 684. Those requirements are set forth in Section 15.50 of the Texas Business and Commerce Code:

> A covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex. Bus. & Com. Code Ann. § 15.50 (a). Section 15.50 thus imposes two threshold requirements that a covenant not to compete must meet in order to be enforceable. The first is a two pronged test: there must exist an *otherwise enforceable agreement* that must have existed *at the time the non-*

10

*compete agreement is made*.  Second, the non-compete agreement must be *ancillary to or part of* that "otherwise enforceable agreement."  We consider each requirement in turn.

### *Otherwise enforceable agreement at the time the non-compete agreement is made*

For the requisite "otherwise enforceable agreement," Trilogy points to Liu's non-disclosure obligations in the PIA.  Under paragraph one of the PIA, Liu agreed to "keep all Proprietary Information in trust for the benefit of Trilogy," "never use any Proprietary Information, except as required by [his] duties to Trilogy," not to "discuss[] Proprietary Information, even in general terms, with persons outside Trilogy," and "to exercise diligence at all times to maintain the confidentiality of all confidential Proprietary Information and not disclose confidential Proprietary Information."  These obligations, furthermore, were to "survive the termination of [Liu's] employment and/or this agreement."

Liu and Callidus do not dispute that Liu's non-disclosure obligations under the PIA are enforceable, but dispute whether they were enforceable *at the time the non-compete agreement was made*, as required by Section 15.50.  This issue turns on the nature of the consideration that supports Liu's non-disclosure obligations.  Like any contract, the PIA must be supported by consideration in order to be enforceable.  *Sheshunoff*, 124 S.W.3d at 684.  "Consideration is a present exchange bargained for in return for a promise.  It consists of either a benefit to the promisor or a detriment to the promisee."  *Id.* (quoting *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) (internal citations omitted)).  Trilogy urges that the requisite consideration it provided in exchange for Liu's return promise not to disclose Trilogy's Proprietary Information was

11

its "promise" under the PIA to provide Liu information and training.  Under paragraph four of the PIA, Liu acknowledged "Trilogy's agreement to provide . . . Proprietary Information and . . . specialized training."  Trilogy thus characterizes the PIA as a bilateral contract—a promise given in exchange for a promise—each of which became enforceable when Liu signed the PIA.

Liu and Callidus urge that Trilogy's "promise" to provide Liu information and training was illusory and thus unenforceable because Liu's employment was indisputably at-will. Standing alone, an at-will employment relationship cannot constitute an "otherwise enforceable agreement" because neither the employer nor the employee are bound to continue the relationship; each is free to discontinue employment in lieu of performance.  *Light*, 883 S.W.2d at 644-45; *Sheshunoff*, 124 S.W.3d at 684.  For the same reasons, an "otherwise enforceable agreement" cannot depend upon an additional period of at-will employment.  Thus, as the supreme court observed in *Light*, an employer's promise of a raise to an at-will employee is illusory and unenforceable because the obligation is dependant upon a period of continued employment, which the employer could avoid by firing the employee.  *Light*, 883 S.W.2d at 645 n.5.  Likewise, a promise whose performance is dependent upon continued at-will employment cannot serve as the consideration necessary to create a bilateral contract comprising an "otherwise enforceable agreement."  *Id.* at 645.

Because Trilogy could have avoided its "promise" under the PIA to provide information and training to Liu merely by terminating Liu's at-will employment relationship, it is illusory and cannot serve as consideration supporting Liu's non-disclosure obligations.  *Light*, 883 S.W.2d at 645 n.5.  Trilogy relies heavily on footnote 14 in *Light* for support of its proposition that its "promise" to give Liu access to confidential information and training in the future was sufficient

12

consideration to support the non-disclosure agreement. Trilogy misreads footnote 14. The footnote states in pertinent part: "If an employer *gives* an employee confidential and proprietary information or trade secrets in exchange for the employee's promise not to disclose them, and the parties enter into a covenant not to compete, the covenant is ancillary to an otherwise enforceable agreement." *Id.* at 647 n.14 (emphasis added). Footnote 14 thus contemplates not a bilateral contract, but a unilateral contract in which the employer's provision of confidential information comprises consideration for the employee's non-disclosure obligations. As the supreme court noted elsewhere in *Light*:

> If only one promise is illusory, a unilateral contract can still be formed; the non-illusory promise can serve as an offer, which the promisor who made the illusory promise can accept by performance. For example, suppose an employee promises not to disclose an employer's trade secrets and other proprietary information, if the employer gives the employee such specialized training and information during the employee's employment. If the employee merely sought a promise to perform from the employer, such a promise would be illusory because the employer could fire the employee and escape the obligation to perform. If, however, the employer accepts the employee's offer by performing, in other words by providing the training, a unilateral contract is created in which the employee is now bound by the employee's promise.

*Id.* at 647 n.6 (citing E. Allan Farnsworth, Contracts 72-82 (1982)) (citations omitted); *see also Sheshunoff*, 124 S.W.3d at 687 ("ASM's acceptance of Johnson's promise to maintain confidentiality by later providing confidential information created a unilateral contract").

The same happened here. Liu and Callidus do not dispute that Trilogy's provision of information and training as contemplated under the PIA gave rise to a unilateral contract binding Liu to his non-disclosure obligations under that agreement. Trilogy urges in the alternative that this

13

unilateral contract comprises the requisite "otherwise enforceable agreement at the time the agreement is made." We disagree. It is undisputed that Trilogy provided the information and training not "at the time the agreement was made," but only at a later time. *See* Tex. Bus. & Com. Code Ann. § 15.50 (a); *Light*, 883 S.W.2d at 645 n.6; *Sheshunoff*, 124 S.W.3d at 687 (distinguishing between unilateral contract created by performance and otherwise enforceable agreement at time agreement was made); *Olander v. Compass Bank*, 172 F. Supp. 2d 846, 854 (S.D. Tex. 2001).[6]

In the further alternative, Trilogy argues that the ESA that Liu signed when leaving Trilogy, which incorporates the terms of the PIA, constitutes an "otherwise enforceable agreement at the time the agreement is made." At the time that Liu signed the ESA, the non-disclosure agreement, as discussed above, was an "otherwise enforceable agreement" because Trilogy had accepted Liu's offer (promising not to disclose) by performance (providing training and information). Furthermore, the ESA itself is a binding agreement made at the time the non-compete agreement was concurrently made within it. However, the question remains whether the non-compete agreement was ancillary either to the non-disclosure agreement or to the ESA at the time either agreement was made and whether there was any consideration for Liu's agreement in the ESA not to compete.

---

[6] Trilogy points out practical problems potentially created by a strict reading of Section 15.50's requirement of an "otherwise enforceable agreement *at the time the agreement is made*." For example, even a momentary pause between Liu's signature and Trilogy's provision of information and training could conceivably preclude enforcement of the non-compete agreement. We are obligated to apply the statute the legislature has enacted. In any event, there is no evidence that Trilogy provided Liu with confidential information immediately upon or only momentarily after he signed the agreement; instead, the event occurred later that day.

14

*Ancillary to an otherwise enforceable agreement*

Under the ESA, Trilogy promised to pay Liu the equivalent of one month's salary in exchange for various promises by Liu, including his reaffirmation of his non-disclosure and non-compete promises. We find that although the ESA was an enforceable contract, it was not of the kind to which a non-competition agreement may be ancillary. We again follow the supreme court's analysis in *Light*:

> [I]n order for a covenant not to compete to be ancillary to an otherwise enforceable agreement between employer and employee:
>
> (1) the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing; and
>
> (2) the covenant must be designed to enforce the employee's consideration or return promise in the otherwise enforceable agreement.

*Light*, 883 S.W.2d at 647. The *Light* court stated, "[t]he otherwise enforceable agreement must give rise to the 'interest worthy of protection' by the covenant not to compete." *Id.* The court cited *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 682 (Tex. 1990), which in turn cited to section 187, comment b of the Restatement of Contracts, noting that business goodwill and confidential or proprietary information are examples of such worthy interests. *Id.* Our sister court in Dallas has interpreted this language in *Light* to mean that a pecuniary interest or a promise by an employer to give notice before termination are not interests worthy of a non-competition covenant. *Strickland v. Meditronic, Inc.*, 97 S.W.3d 835, 839 (Tex. App.—Dallas 2003, pet. dism'd w.o.j) ("Medtronic's consideration is the promise to give ninety days notice prior to terminating without cause and the

15

promise to compensate Strickland in the event of economic hardship resulting from the non-compete agreement. Such promises do not give rise to an interest worthy of protection by a covenant not to compete.").

This Court has previously come to a similar conclusion: "ASM's non-illusory promise to give at least two weeks' notice before terminating Johnson does not give rise to its interest in restraining Johnson from competing." *Sheshunoff*, 124 S.W.3d at 687. In this case, Liu was allowed to stay on Trilogy's payroll for an extra month to preserve his immigration status. Although the consideration in this case is more substantial than that in *Sheshunoff,* we conclude that the one month of employment promised in the ESA does not give rise to Trilogy's interest in restraining Liu from competing and, therefore, is not an "interest worthy of protection" by the covenant not to compete. *See Light*, 883 S.W.2d at 647.

As to the non-disclosure agreement, although it serves as an "otherwise enforceable agreement" at the point in time that Liu reaffirmed the non-competition covenant within the ESA, and the interest of preserving the confidentiality of information is an interest worthy of protection by a covenant not to compete, there is a separate problem of consideration for Liu's reaffirmation of his promise. Trilogy's past provision of proprietary information and specialized training would be past consideration and therefore not competent consideration for contract formation. *See Sheshunoff*, 124 S.W.3d at 687. When we evaluate the ESA at the time it was made, Trilogy's provision of confidential information and training to Liu before signing the agreement will not support its promises in the agreement. *Roark*, 813 S.W.2d at 496 ("Consideration is a present exchange bargained for in return for a promise."); *see also* Jordan Leibman & Richard Nathan, *The*

16

*Enforceability of Post-employment Noncompetition Agreements Formed After At-Will Employment*

*Has Commenced: the "Afterthought" Agreement*, 60 S. Cal. L. Rev. 1465, 1528-29 (1987) ("If

anything in the classical law of contracts is clear, it is that past consideration is not good

consideration. Any exchange has to be contemporaneous by definition, because the promise and the

consideration for that promise must serve as reciprocal conventional inducements."); *see also*

*Sheshunoff*, 124 S.W.3d at 687.

In this case, the only proffered consideration was the financial incentives that were

offered to Liu in ESA. However, as we have noted, financial benefits do not give rise to an "interest

worthy of protection" by the covenant not to compete. *Sheshunoff*, 124 S.W.3d at 687; *see also*

*Strickland*, 97 S.W.3d at 839. Therefore, we hold that the non-compete agreement was not

enforceable and overrule Trilogy's first and second issues.[7]

**Trade secret misappropriation**

Misappropriation of trade secrets is a common-law tort cause of action. The elements

of misappropriation are: (1) existence of a trade secret; (2) breach of a confidential relationship or

improper discovery of a trade secret; (3) use of the trade secret; and (4) damages. *IBP, Inc. v.*

---

[7] Liu and Callidus also urged that the non-compete agreement was also unenforceable because it exceeded Section 15.50's geographic scope restrictions. Tex. Bus. & Com. Code Ann. § 15.50 (West 2002). Trilogy disagrees, and urges that even if the non-compete agreement is overbroad, we would be required to reverse the trial court and remand for a reformation. *Id.* § 15.51(c) (West 2002). Because we hold that the non-compete agreement fails to satisfy Section 15.50's threshold requirements that it be "ancillary to or part of an otherwise enforceable agreement at the time the agreement is made," we need not reach this ground.

*Klumpe*, 101 S.W.3d 461, 476 (Tex. App.—Amarillo 2001, pet. denied) (citing *Taco Cabana Int'l*

*v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir. 1991)). A "trade secret"

> may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.
>
> * * *
>
> A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article.

*Hyde Corp. v. Huffines*, 314 S.W.2d 763, 777 (Tex. 1958) (quoting Restatement of Torts § 757).

"Use" of a trade secret means commercial use, by which a person seeks to profit from the use of the

secret. *Atlantic Richfield Co. v. Misty Prods., Inc.*, 820 S.W.2d 414, 421 (Tex. App.—Houston [14th

Dist.] 1991, writ denied).

Trilogy raises three arguments challenging the trial court's granting of summary

judgment against its trade secret misappropriation claim. We can quickly dispose of two. First,

Trilogy argued in the trial court and in its briefing that if Liu and Callidus have not already

misappropriated its trade secrets, they would "inevitably" do so in the course of Liu's work.

However, Trilogy's counsel conceded at oral argument that, due to the passage of time, this case is

no longer one to which the "inevitable disclosure" doctrine, if recognized in Texas, would apply.[8]

---

[8] Trilogy also concedes in its briefing that "[c]ourts applying Texas law have recognized inevitable misappropriation as an appropriate basis for an *injunction* against former employees . . . ."

Second, Trilogy urges that the trial court abused its discretion in refusing to continue the summary judgment hearing to enable it to obtain additional discovery on its misappropriation claims. In support, Trilogy cites an affidavit from its attorney stating merely that certain of its discovery requests were still outstanding—and nothing more. We reject Trilogy's argument because its affidavit does not explain *why* it needs this discovery, as required by Tex. R. Civ. P. 166a(g), nor has it filed a verified motion for continuance under Tex. R. Civ. P. 252. *See Tenneco Inc. v. Enterprise Prod. Co.*, 925 S.W.2d 640, 647 (Tex. 1996).[9] The trial court did not abuse its discretion in proceeding to rule on Liu's and Callidus's summary judgment motions.

Trilogy's third argument is that the summary judgment evidence, as developed before the summary judgment hearing, presented a fact issue as to whether Liu or Callidus had already used Trilogy trade secrets in the development of the TrueComp product. It points to two pieces of evidence. First, Trilogy references a March 10, 2003, e-mail Liu received from one of the Accenture team members assigned to the prospective Aetna deployment, Stephen Shohen. Second, Trilogy points to Liu's involvement in identifying issues related to implementing TrueComp in Aetna's business environment.

---

(Emphasis added.) *See also Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 242 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("We have found no Texas case expressly adopting the inevitable disclosure doctrine . . . .").

[9] In fact, Trilogy did not explicitly seek a continuance in writing, either in a separate motion or in its summary judgment response. Instead, it merely urged, in a footnote to its summary judgment response, that its assertions regarding trade secret misappropriation should not be considered to be exhaustive because discovery was still ongoing.

19

*The Accenture e-mail*

This e-mail was sent around the time Liu completed his initial training at Callidus. During the morning of March 10, Shohen e-mailed Liu to "touch base" so they could begin preliminary work preparing for the possible deployment of TrueComp at Aetna. Shohen had noted that much of the preliminary work would involve design of the inbound and outbound interfaces through which data would be moved, as well as "some Comp Plans work which you will also be able to help us with." Later that same day, Shohen sent Liu the e-mail in question. Shohen asked Liu to "[t]ake a look at the attached files for some background on the project and on the ETL [extraction, transfer, and loading] portion specifically." Shohen attached to the e-mail approximately fifty documents in five ZIP files. Trilogy specifically identifies only one document that it claims contained its trade secrets, a spreadsheet that describes the data model or schema that Trilogy used in its DMS product. Liu and Callidus do not dispute that these files contained Trilogy trade secret information but dispute whether there is any evidence that either used this information. We agree with Liu and Callidus that Trilogy has not raised a fact issue as to whether Liu or Callidus used any of the ZIP files in their work on the TrueComp product.

Trilogy offers no explanation or proof regarding whether or how Liu or Callidus used, or could have used, Trilogy's DMS data schema in their work on the TrueComp deployment. Rather, it urges that Liu's mere receipt of the e-mail from an Accenture consultant asking him to "take a look" is circumstantial proof that he did, in fact, (1) look at the information and (2) somehow use it in his work to benefit Callidus. Inferences stacked only upon inferences is no evidence. *See, e.g.*, *Marathon Oil Co. v. Pitzner*, 106 S.W.3d 724, 728 (Tex. 2003). In fact, there is uncontroverted

20

summary judgment evidence—specifically, the deposition testimony of Callidus's Betty Costa, in response to questioning by Trilogy's counsel—that Trilogy's DMS data schema had nothing to do with product design or how a product uses the data, and she did not see how it could be used to a competitive advantage. Trilogy made no attempt to controvert this evidence or otherwise explain how Liu or Callidus used Trilogy's data schema, such as it might have done through Liu, Trilogy witnesses, or expert testimony. Standing alone, Liu's receipt of the e-mail from Shohen does not raise a genuine issue of material fact that he or Callidus actually used Trilogy's trade secrets in their initial work on the TrueComp deployment.

### *Identifying implementation issues*

Trilogy also relies on evidence of Liu's proficiency in identifying issues that Callidus would need to address in adapting TrueComp to the complexities in Aetna's business system. The summary judgment record illustrates that in late March, Liu and Accenture's Shohen were working together on developing the Aetna "Comp Plan." The two discussed via e-mail an issue relating to which Aetna business variables best corresponded with TrueComp data fields, and Liu discussed this issue with Paul Devlin of Callidus's Advanced Technology Group. By March 27, Liu had prepared a preliminary version of the Comp Plan, which he e-mailed to Shohen with a notation indicating there were complications in his analysis. Sometime around April 1, Liu and Shohen discussed these complications with Saied Karamooz, a more senior Accenture consultant. This prompted Karamooz to send Liu an e-mail expressing alarm that the issues had not previously been addressed and urging Liu to "engage the right technical experts to determine the most optimal approach for handling

21

Aetna's requirements." Karamooz copied Brian Burkhart, Callidus's managing director for eastern sales, who e-mailed Liu to request that Liu send him his concerns so they could get executive level attention. Liu responded with a list of "several basic requirements which can't be addressed by the stock product." The list included the issue Liu had previously discussed with Devlin, as well as several other issues. Burkhart obtained feedback from Callidus executives, which referred Liu to David Kelly. Liu requested help from Kelly. Meanwhile, Liu examined the TrueComp sales document and model product that Callidus's sales personnel had presented at Aetna and advised Bryan Burkhart that "they didn't capture the difficult issues that I raised in my earlier e-mail." Later the same day, Kelly responded to Liu's request for help, making a suggestion regarding how Liu could draw upon existing functionality in the TrueComp product to address one issue. On the following day, Kelly e-mailed Liu, Karamooz, and Shohen, copied to Callidus executives, a document "with some ideas for possible solutions for the specific issues raised regarding the Aetna broker comp plan."

Trilogy urges that the foregoing sequence of events raises a fact issue as to whether Liu or Callidus misappropriated Callidus trade secrets in planning the deployment of TrueComp to Aetna's business environment. In its pleadings and during discovery, Trilogy claimed trade secret protection for the specific solutions it devised to address "the difficulties inherent in implementing a compensation-management system meeting Aetna's requirements while coping with the complexities of its compensation system." But Trilogy does not now claim that Callidus or Liu misappropriated its specific solutions or technology when devising solutions of their own, except

22

in one very broad respect: Trilogy claims that Liu's mere knowledge of *a* solution devised by Trilogy made easier the discovery of Callidus' distinct, alternative solutions.[10]

Trilogy cites no authority to support this theory of trade secret protection. Absent further guidance from the Texas Supreme Court, we decline to extend Texas trade secret protections so broadly. Furthermore, Trilogy's own summary judgment evidence indicates that it was Kelly, not Liu, who devised Callidus' solutions to the TrueComp deployment issues. Trilogy points to no evidence that Liu was involved in developing those solutions, much less that he misappropriated Trilogy trade secrets in the process. Instead, Liu's role appears to have been limited merely to identifying the issues presented by Aetna's business environment.

Trilogy also attempts to claim trade secret protection for Liu's knowledge of the issues themselves. As Trilogy observes, information that a firm compiles regarding its customers may enjoy trade secret status under Texas law. *Huffines*, 314 S.W.2d at 777 (quoting Restatement of Torts § 757) (trade secrets may include any "compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it," and "may be . . . a list of customers."); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, no pet.) ("Items such as customer lists, pricing information, client information, customer preferences, buyer contacts . .

---

[10] Trilogy relies on deposition testimony of its corporate representative, who opined that "the concept of the misappropriation of trade secrets has to do with solving the same problem, as opposed to using the same technology" and "it's just sort of a well understood concept of computer science that there's lots of ways to solve these problems, but once you've got one solution, the rest are much easier to find."

23

. have been shown to be trade secrets."); *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 (Tex. App.—Dallas 1993, no writ) (customer lists and identities of clients and prospective clients could be trade secrets).[11] But this does not mean that trade secret status automatically attaches to any information that a company acquires regarding its customers; if it did, it would amount to a *de facto* common law non-compete prohibition.

Before information can be a "trade secret," there must be a substantial element of secrecy. *American Precision Vibrator Co. v. National Air Vibrator Co.*, 764 S.W.2d 274, 276 (Tex. App.—Houston [1st Dist.] 1988, no writ). "Secrecy" in this sense is not limited solely to confidentiality, but also requires that the information "is not generally known or readily ascertainable by independent investigation." *Rugen*, 864 S.W.2d at 552; *Allan J. Richardson & Assocs., Inc. v.*

---

[11]   Trilogy also cites several trade secret misappropriation cases that are clearly distinguishable from the facts before us. *See Computer Ass'n Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996); *Gonzales v. Zamora*, 791 S.W.2d 258, 265 (Tex. App.—Corpus Christi 1990, no pet.); *Metallurgical Indus., Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1200-01 (5th Cir. 1986) (interpreting Texas law); *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 502-03 (5th Cir. 1982) (same). In *Altai*, the defendant took copies of highly confidential source code from the plaintiff employer and the evidence showed that the defendant's new employer had used the source code in its own systems. 918 S.W.2d at 455. In *Gonzales*, evidence indicated that the defendant, a former employee of the plaintiff, took and used forms that had been created by the plaintiff, and that no other company possessed at the time, in the defendant's competing business. 791 S.W.2d at 262. In *Fourtek, Inc.*, defendants, in the course of a business deal, saw modifications that the plaintiff had engineered to a zinc reclaiming furnace. 790 F.2d at 1197. The defendants then formed a company on their own and began selling furnaces equipped with the exact same modifications. *Id.* at 1198. In *FMC*, the court enjoined the plaintiff's former employee from working for the plaintiff's competitor because it was shown that the competitor had tried to engineer a duplicate of the plaintiff's product but had been unable to do so and that the competitor had "historically copied FMC's products where it could because it was the least expensive way to compete." 677 F.2d at 501. The employee that the competitor had sought to employ was the engineering manager of the product that the competitor could not duplicate. *Id.* at 500-01.

24

*Andrews*, 718 S.W.2d 833, 837 (Tex. App.—Houston [14th Dist.] 1986, no writ) (emphasis added).

"When money and time are invested in the development of a procedure or device which is based on an idea which is not new to a particular industry, and when that certain procedure or device is not generally known, trade secret protection will exist." *Gonzales*, 791 S.W.2d at 264. However, information generally known and readily available is not protectable. *Id.* Consistent with this concept of secrecy, a former employee may use the general knowledge, skills, and experience acquired during employment to compete with a former employer. *T-N-T Motorsports*, 965 S.W.2d at 22; *Gonzales*, 791 S.W.2d at 267. "It is . . . the burden of the party claiming secrecy status to prove secrecy"—or in this case, provide more than a scintilla of evidence to support its claims. *Stewart & Stevenson Services, Inc. v. Serv-Tech, Inc.*, 879 S.W.2d 89, 99 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (citing *Richardson v. Andrews*, 718 S.W.2d 833 (Tex. App.—Houston [14th Dist.] 1986, no writ).

Trilogy has failed to meet this burden with regard to its claim of trade secret protection for knowledge of "the difficulties inherent in implementing a compensation-management system meeting Aetna's requirements while coping with the complexities of its compensation system." There is no evidence that these difficulties are not readily ascertainable to someone with Liu's general knowledge, experience and skill set,[12] and there is uncontroverted evidence that Aetna disclosed the inner workings of its compensation system to both Callidus and Accenture. Liu's general knowledge of the issues presented by a customer's compensation system, moreover, stands

---

[12] Trilogy acknowledges that no one with Liu's credentials had worked at Callidus before Liu.

25

in sharp contrast to the types of customer information that have been held to comprise trade secrets, which characteristically have been compiled over long periods of time, through use of substantial resources, and are shown to provide a competitive advantage. *See T-N-T Motorsports*, 965 S.W.2d at 22-23 (customer database, which contained names, addresses, telephone numbers, types of vehicles customers owned, birthdays and e-mail addresses, had been compiled over four years); *H.E. Butt Grocery Co. v. Moody's Quality Meats, Inc.*, 951 S.W.2d 33, 39 (Tex. App.—Corpus Christi 1997, writ denied) (court reversed trial court's judgment that marinade recipe was trade secret based on evidence that recipe was not uncommon in industry and had been previously published).[13]

Trilogy has failed to meet its burden of raising a genuine issue of material fact in response to Liu and Callidus's "no evidence" summary judgment motions to support its trade secret misappropriation claims. We overrule Trilogy's fifth and sixth issues.

**Claims regarding the non-disclosure agreement**

Trilogy asserts that the trial court erred in two ways when granting summary judgment on its claims that Liu breached the non-disclosure agreement and that Callidus tortiously interfered with that agreement. First, Trilogy urges that neither defendant sought summary judgment on its

---

[13] *See also De Santis v. Wackenhut, Corp.*, 793 S.W.2d 670, 684 (Tex. 1990) (non-compete agreement was unnecessary to protect information regarding identity of employer's customers, and "their special needs and requirements" where employer failed to show "that its customers could not readily be identified by someone outside its employ, that such knowledge carried some competitive advantage, or that its customers' needs could not be ascertained simply by inquiry addressed to those customers themselves.").

26

claim that Liu breached the non-disclosure agreement.[14]  Trilogy draws two conclusions from this

asserted omission.  As to Liu, Trilogy asserts that the trial court erred in granting summary judgment

on a ground not raised in Liu's motion.  *See* Tex. R. Civ. P. 166a(c); *Science Spectrum, Inc. v.*

*Martinez*, 941 S.W.2d 910, 912 (Tex. 1997).  As to Callidus, Trilogy argues that Callidus cannot

dispute for purposes of summary judgment that Liu breached the non-disclosure agreement, and must

rely solely on the ground that it did not commit a "willful act of interference."

Trilogy's second complaint is that evidence raised fact issues regarding both Liu's

breach of the non-disclosure agreement and Callidus's willful interference with it.  As concerning

Liu's alleged breach, Trilogy points to the same evidence on which it relied regarding its

misappropriation claims.

We agree with both of Trilogy's arguments concerning these claims against Liu.  We

also agree that the evidence raises a fact issue regarding whether Callidus tortiously interfered with

Liu's non-disclosure obligations.

### Scope of Liu's summary judgment motion

As his "Bases for Summary Judgment," Liu asserted that he was entitled to summary

judgment on each of three sets of grounds, which he listed as headings:  "Trilogy's claim for breach

of contract," "Trilogy's claim of misappropriation of trade secrets," and "Trilogy's claim of

---

[14]  Trilogy also argues that neither defendant sought summary judgment on the ground that the non-disclosure agreement is unenforceable, and that the trial court would have erred in granting summary judgment on that ground.  As noted previously, neither Liu nor Callidus appear to dispute that the non-disclosure agreement is enforceable.

inevitable disclosure of trade secrets." Under the breach of contract heading, Liu asserted only two grounds:

1. Liu's covenant not to compete is unenforceable as a matter of law because it is not ancillary to an otherwise enforceable agreement at the time the agreement was made.

2. Even if the covenant not to compete were ancillary to an otherwise enforceable agreement, Liu's covenant not to compete is unenforceable as a matter of law because it is not reasonably limited so as to impose no greater restraint than is necessary to protect the legitimate business interests, if any, of Trilogy.

Liu makes no reference in this section of his motion to Trilogy's claim for breach of the non-disclosure agreement, nor does he incorporate by reference arguments made elsewhere in the motion.

Liu responds that Trilogy's argument is "disingenuous" because he asserted in the "misappropriation of trade secret" section of his motion that "Trilogy has presented no evidence that Liu has misused any confidential information of Trilogy, let alone any information that would constitute a trade secret." Liu thus suggests that this ground, as it relates to "confidential information," is substantively identical to an assertion that there is no evidence Liu breached the non-disclosure agreement, and that this was sufficient to satisfy the requirements of Tex. R. Civ. P. 166a(c). We disagree for two reasons.

First, Liu's assertion that there is no evidence of misuse of "confidential information" is narrower than an assertion that there is no evidence Liu breached his non-disclosure obligations under the PIA. Certain of the non-disclosure obligations of the PIA extend not only to trade secrets or "confidential" information, but also to some non-confidential "proprietary information."

28

Second, even if Liu's summary judgment ground that "Trilogy has presented no evidence that Liu has misused any confidential information of Trilogy" is substantively equivalent to a contention that Trilogy presented no evidence that Liu breached his non-disclosure obligations, Liu failed to properly assert this ground as against Trilogy's breach of contract claim. The Texas Supreme Court, consistent with the strict view of Rule 166a(c) it has espoused in recent years,[15] has previously rejected a similar attempt to "bootstrap" a summary judgment ground regarding a claim from one asserted elsewhere in the motion regarding a different claim. *See Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 203-04 (Tex. 2002).

Brewer & Pritchard, a law firm, sued Chang, a former associate, and Johnson, another lawyer with whom Chang formed a partnership, for breach of fiduciary duty, actual and constructive fraud, conversion, and negligence after Chang allegedly profited from assisting a potential client of the firm in finding counsel outside the firm. Chang and Johnson moved for summary judgment against the firm's breach of fiduciary duty claims on the sole ground that Chang did not owe any fiduciary obligation to the firm. The supreme court rejected this ground, holding that Chang and Johnson owed a fiduciary duty not to profit or gain from assisting the potential client in finding counsel other than the firm. *Id*. Of importance here, Chang and Johnson had also asserted elsewhere in its motion summary judgment grounds in regard to other claims that were substantively identical to an assertion that Chang did not breach his fiduciary duty. *Id*. Nonetheless, the supreme court held

---

[15] *E.g.*, *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 339-41 (Tex. 1993) ("A motion for summary judgment must stand or fall on the grounds expressly presented in the motion.").

that "Johnson and Chang were not entitled to summary judgment on the basis of no breach of fiduciary duty because they did not include that ground in their motion." *Id.* at 204. It reasoned that Chang and Johnson "did not make these arguments in connection with the breach of fiduciary duty claim," "the sections of the motion dealing with those claims" where the arguments were made "was [sic] not incorporated by reference or otherwise mentioned in the section that dealt with fiduciary duty," and they did not incorporate by reference evidence they cited in a "Procedural Background" that would have supported that ground. *Id.* at 203-04.

Liu's summary judgment motion suffers from the same faults in regard to Trilogy's breach of non-disclosure agreement claim. Although Liu asserted in regard to the trade secret misappropriation claim the ground that no evidence exists that he disclosed confidential information, Liu did not make this argument in regard to the breach of contract claims, nor did he incorporate by reference the grounds he asserted elsewhere. We are thus compelled to hold that the trial court erred in granting summary judgment against Trilogy on its claims that Liu breached his non-disclosure obligations. Furthermore, as we hold below, there is a fact issue as to whether Liu breached his non-disclosure obligations.

### *Callidus's summary judgment motion*

Callidus's summary judgment motion was largely parallel to Liu's. Like Liu, Callidus did not explicitly move for summary judgment on the ground that there is no evidence Liu breached his non-disclosure obligations. However, Callidus did move for summary judgment on Trilogy's tortious-interference claim on the additional ground that "Trilogy has presented no evidence of a

30

willful act of interference by Callidus."[16] Trilogy and Callidus dispute how broadly this summary

judgment ground extends and whether Trilogy raised a fact issue regarding it.[17] We will assume for

---

[16] Under the heading "Callidus Is Entitled to Summary Judgment on Trilogy's Claims of Tortious Interference With Contract," it asserted the following three grounds:

1. Callidus cannot be liable for tortious interference with Liu's covenant not to compete is unenforceable as a matter of law and therefore cannot form the basis of a claim of tortious interference.

2. Even if the covenant not to compete were ancillary to an otherwise enforceable agreement, Callidus cannot be liable for tortious interference with Liu's covenant not to compete because it is unenforceable as a matter of law because it is not reasonably limited so as to impose no greater restraint than is necessary to protect the legitimate business interests, if any, of Trilogy.

3. Trilogy has presented no evidence of a willful act of interference by Callidus.

Like Liu, Callidus asserts in a "misappropriation of trade secret" section of its motion that "Trilogy has presented no evidence that Liu has misused any confidential information of Trilogy, let alone any information that would constitute a trade secret."

[17] The elements of tortious interference with an existing contract are: (1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred. *See, e.g.*, *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997); *New York Life Ins. Co. v. Miller*, 114 S.W.3d 114, 125 (Tex. App.—Austin 2003, no pet.). Callidus's summary judgment ground that "Trilogy has presented no evidence of a willful act of interference by Callidus" references the second element. Trilogy characterizes this summary judgment ground and the "act of interference" element as concerning only whether Callidus sought to induce Liu to breach his non-disclosure obligations, not whether Liu in fact breached those obligations. Whether Liu actually breached those obligations, Trilogy contends, goes to the third element, proximate cause. Hence, Trilogy extrapolates, the sole issue raised by Callidus's summary judgment motion regarding tortious interference is whether there is a fact issue regarding whether Callidus willfully and intentionally attempted to induce Liu to breach his non-disclosure obligations.

To raise a fact issue on the issue of inducement, so defined, Trilogy points to evidence that Callidus originally contacted Liu while he was still working at Trilogy, that Callidus hired him with

31

purposes of our analysis that, as Callidus contends, the controlling issue is whether the summary judgment evidence raises a fact issue regarding whether Liu breached his non-disclosure obligations. We hold that it does.

Liu's non-disclosure obligations under the PIA are not limited solely to protection of trade secrets.[18] "Proprietary Information," as noted previously, includes "information, ideas, and materials of or about Trilogy or its . . . customers, or others with whom Trilogy conducts business," as well as "information, ideas, or materials of a business nature such as . . . information relating to . . . customers." Liu agreed "to keep all Proprietary Information in trust for the benefit of Trilogy"

---

the intent to deploy him on the Aetna account, and that Callidus placed Liu in a key role on the Aetna account a short time after he began work for the company. Furthermore, Trilogy points out that over a year before Callidus initiated contact with Liu, Trilogy had sent a letter to Callidus's general counsel, in response to Callidus's hiring of a former Trilogy employee, warning that former Trilogy employees "are still subject to the confidentiality and non-solicitation obligations agreed to by each employee when accepting employment with Trilogy." Attached to the letter was a version of the PIA containing non-disclosure obligations similar to the one Liu later signed.

Callidus disagrees, contending that its summary judgment ground and the "act of interference" element subsume the issue of whether Liu breached his non-disclosure obligations. *See Paul Mitchell Sys. v. Randall's Food Mkts., Inc.*, 17 S.W.3d 721, 731 (Tex. App.—Austin 2000, pet. denied) ("A party must be more than a willing participant" to "interfere" with contract; "it must knowingly induce one of the contracting parties to breach its obligations.").

We need not address this rather ethereal legal issue because, as discussed above, we agree with Trilogy's alternative argument that the evidence raises a fact issue as to whether Liu breached his non-disclosure obligations.

[18] *See Simplified Telesys., Inc. v. Live Oak Telecom, L.L.C.*, 68 S.W.3d 688, 692-93 (Tex. App.—Austin 2000, no pet.) (status of information as trade secret did not govern whether party breached confidentiality agreement that was not limited solely to trade secret information).

and "never use any Proprietary Information, except as required by my duties to Trilogy." He also acknowledged his understanding "that this prohibition prevents me from discussing Proprietary Information, even in general terms, with persons outside Trilogy" and that "Proprietary Information that is not generally known to the software industry or the public is confidential." Further, Liu agreed "to exercise diligence at all times to maintain the confidentiality of all confidential Proprietary Information and not disclose confidential Proprietary Information. [And] I understand that my obligation to keep Proprietary Information strictly confidential shall survive the termination of my employment and/or this agreement."

The summary judgment record raises a fact issue as to whether Liu violated these prohibitions by drawing upon his knowledge of Aetna's business requirements and the complexities of its agent compensation system, which he originally acquired while working at Trilogy on the DMS product, in identifying and addressing shortcomings in the Callidus TrueComp product. Viewing the summary judgment record in the light most favorable to Trilogy, Callidus had not previously identified those issues and was not likely to do so, at least as quickly as Liu did, and it is reasonable to infer that Liu would have been unable to so quickly determine the inadequacies of Callidus's software to deal with the complexities of Aetna's need had he not used the customer information that he had garnered through working on the Aetna account at Trilogy. Liu was prohibited by the PIA from using or disclosing this information in his work for Callidus. We sustain Trilogy's issues regarding its claims that Liu breached his non-disclosure obligations and that Callidus tortiously interfered with those obligations.

33

## CONCLUSION

We affirm the trial court's summary judgment as to Trilogy's trade secret misappropriation claims, its claim that Liu violated a non-compete agreement, and its claim that Callidus tortiously interfered with a non-compete agreement. We reverse the summary judgment as to Trilogy's claim that Liu breached his contractual non-disclosure obligations and that Callidus tortiously interfered with those obligations and remand for further proceedings consistent with this opinion.

_____

Bob Pemberton, Justice

Before Justices Kidd, B. A. Smith and Pemberton

Affirmed in Part; Reversed and Remanded in Part

Filed:   August 12, 2004

34