# NO. 12-09-00204-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *CHAD GORMAN,* *APPELLANT* | § | *APPEAL FROM THE* |
| *V.* | § | *COUNTY COURT AT LAW #2* |
| *CCS MIDSTREAM SERVICES, L.L.C.,* *APPELLEE* | § | *GREGG COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Chad Gorman appeals the trial court's grant of CCS Midstream Services, L.L.C.'s motion for partial summary judgment. Gorman raises two issues on appeal. We reverse and remand.

## BACKGROUND

Gorman was employed as a controller at Mobley Oil Field Services LP (Mobley). During his employment with Mobley, Gorman never signed an employment agreement, and his employment with Mobley was "at will." In 2007, Mobley's owners sold its assets to CCS Energy Services LLC, which subsequently became CCS Midstream Services, L.L.C. (CCS).[1] CCS is in the oilfield services industry, which includes the transportation, management, and disposal of oilfield fluids and liquids that are used or produced as waste in the drilling, completion, and production of oil and gas wells. Prior to CCS's acquisition of its assets, Mobley was engaged primarily in the trucking operations aspect of the oilfield services industry, as well as owning and operating "frac" tanks for hydraulic fracturing treatments in oil and gas wells. CCS, although experienced in providing oilfield services, lacked expertise in the trucking and "frac" tank operations, which is the reason it acquired Mobley's assets.

---

[1] The exact date of this change is unclear in the record. For ease of reference, both CCS entities are referred to as CCS in this opinion.

During the acquisition of Mobley's assets, CCS made offers of employment to some of Mobley's high level employees, including Gorman. Among other things, the offer of employment contained a covenant not to compete and mandated that Gorman refrain from going to work for a competitor.[2] The duration of the covenant equaled the length of Gorman's employment, not to exceed two years. The covenant also provided that Gorman "acknowledges that in the course of his . . . employment with [CCS], [CCS] will provide [Gorman] with confidential and proprietary information and/or specialized training concerning [CCS's] business."

Gorman signed the agreement on March 8, 2007, and began working for CCS. According to Gorman, CCS immediately began diminishing his job responsibilities. On June 30, 2007, CCS hired Administaff Companies II, L.P. (Administaff) to administer its payroll, employee benefits, and other related functions. To that end, employees of CCS, including Gorman, signed separate employment agreements with Administaff.[3] Over time, Gorman's satisfaction with his employment decreased due to his diminished role. In February 2008, Gorman began looking for other employment and contacted Steve Nations at Pinnergy, Ltd. (Pinnergy), a direct competitor with CCS.[4] After meeting with Nations and other executives at Pinnergy, Gorman ultimately accepted employment at Pinnergy, and resigned from CCS and Administaff on May 30, 2008. CCS sent Gorman a letter dated June 10, 2008, in which it reminded Gorman of his responsibility to comply with the covenant not to compete. CCS discovered that Gorman began working for Pinnergy in what it believed to be a capacity similar to his position with CCS. Consequently, CCS filed suit against Gorman to enforce the covenant not to compete. In its petition, CCS sought a temporary restraining order, a temporary injunction, and a permanent injunction barring Gorman from continuing his employment with Pinnergy. CCS also sought to recover damages and attorney's fees.

---

[2] Although there was no express statement in the agreement, Mobley employees generally assumed that they were required to sign the agreement to maintain their employment with CCS.

[3] Gorman's employment agreement with Administaff purported to create a dual employment relationship in which Gorman was employed by both CCS and Administaff. The Administaff agreement stated that it did not alter the existing employment agreement between CCS and Gorman and that termination of the Administaff agreement was not necessarily termination of the CCS agreement.

[4] It is undisputed that Pinnergy is a CCS competitor.

The trial court issued an ex parte temporary restraining order (TRO) on July 11, 2008, and later extended the TRO until it made its ruling on the temporary injunction. The trial court held a temporary injunction hearing on July 17, 2008, during which it heard testimony from Gorman and Robert Miracle, the general manager and Gorman's supervisor at Mobley, and later, at CCS. On August 5, 2008, the trial court issued a temporary injunction. Based on the evidence and testimony adduced at the temporary injunction hearing, CCS filed a motion for partial summary judgment, asserting that the covenant not to compete was enforceable as a matter of law and that Gorman had violated the covenant. Miracle gave an oral deposition on October 6, 2008. Gorman obtained leave to file a response to the motion for partial summary judgment, and included Miracle's oral deposition as evidence. The trial court ultimately granted CCS's motion for partial summary judgment. No other issues remained after a subsequent hearing on attorney's fees, and the trial court issued its "Amended Final Judgment for Permanent Injunction and Attorney['s] Fees" on April 7, 2009. The trial court awarded CCS attorney's fees in the amount of $37,279.50[5] and postjudgment interest at the rate of 6%. Gorman appealed.

## COVENANT NOT TO COMPETE

In his first issue, Gorman asserts that the trial court erred in granting summary judgment on CCS's breach of employment contract claim because the covenant not to compete in the employment contract is unenforceable as a matter of law, or alternatively because he complied with the covenant.

### Standard of Review

In a traditional motion for summary judgment, if the movant's motion and summary judgment evidence facially establish the movant's right to judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine issue of material fact sufficient to defeat summary judgment. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000). The evidence raises a genuine issue of material fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

Summary judgment is a question of law, and we therefore review a trial court's summary judgment decision de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289

---

[5] Gorman does not challenge the award of attorney's fees in this appeal.

S.W.3d 844, 848 (Tex. 2009). The standard of review for a traditional summary judgment motion is threefold: (1) the movant must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue precluding summary judgment, the court must take evidence favorable to the nonmovant as true; and (3) the court must indulge every reasonable inference in favor of the nonmovant and resolve any doubts in the nonmovant's favor. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985); *see* TEX. R. CIV. P. 166a(c).

Whether a covenant not to compete is enforceable is a question of law for the court. *Fielding*, 289 S.W.3d at 848. Likewise, what constitutes sufficient consideration for a contract is generally a question of law, but can be a question of fact. *Burges v. Mosley*, 304 S.W.3d 623, 629 (Tex. App.—Tyler 2010, no pet.) (question of law); *Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) (holding factual questions remained on consideration issue in summary judgment case due to failure to produce conclusive proof).

**Applicable Law**

A covenant not to compete is enforceable if it is (1) ancillary to or part of an otherwise enforceable agreement at the time the agreement is made and (2) reasonable, not imposing a greater restraint than is necessary to protect the goodwill or other business interest of the employer. TEX. BUS. & COM. CODE ANN. § 15.50(a) (Vernon 2011). The first element can be broken down into two inquiries: (1) is there an "otherwise enforceable agreement," and (2) was the covenant not to compete "ancillary to or part of" that agreement at the time the otherwise enforceable agreement was made. *Fielding*, 289 S.W.3d at 849. With regard to the first inquiry, "otherwise enforceable agreements" can emanate from at-will employment so long as the consideration for any promise is not illusory. *Id.* As to the second inquiry, for a covenant not to compete to be "ancillary to or part of" an otherwise enforceable agreement, the employer must establish both "(1) that the consideration given by the employer in the otherwise enforceable agreement [gives] rise to the employer's interest in restraining the employee from competing; and (2) that the covenant [was] designed to enforce the employee's consideration or return promise in the otherwise enforceable agreement." *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 649 (Tex. 2006). Business goodwill and confidential or proprietary information are examples of interests that can be, in appropriate circumstances, worthy of protection by a covenant not to compete. *Id.* However, for a covenant not to compete to be

4

enforceable, the agreement must be designed to enforce the return promises made by the employee. *Id.*

Prior to *Sheshunoff*, there was confusion about whether the employer's promise to provide confidential and proprietary information could create a unilateral contract upon actual performance of that promise by the employer. *Sheshunoff* answered that question in the affirmative. *See id.* at 651. In *Fielding*, the Texas Supreme Court clarified its holding in *Sheshunoff* as follows:

> In *Sheshunoff*, an employee signed an at-will employment agreement containing a covenant not to compete. In the agreement, the employer promised to provide the employee access to confidential information and the employee promised not to disclose such information. The employer then gave the employee access to confidential information throughout his employment. We followed and confirmed our analysis in *Light*, with the exception of *Light's* footnote six. We concluded that under section 15.50, a covenant not to compete is not invalid simply because the otherwise enforceable agreement to which the covenant is ancillary is not enforceable at the time the agreement is made. Rather, the covenant not to compete need only be "ancillary to or part of" the agreement at the time the agreement is made. Thus, the requirement that there be an "otherwise enforceable agreement" can be satisfied by the employer actually performing its illusory promise to provide an employee with confidential information.

*Fielding*, 289 S.W.3d at 849-50 (internal citations omitted).

However, for a covenant not to compete to be enforceable, it must still be supported by consideration. *Powerhouse Prods., Inc. v. Scott*, 260 S.W.3d 693, 696 (Tex. App.—Dallas 2008, no pet.) (citing *Sheshunoff*, 209 S.W.3d at 651). Past consideration is insufficient. *Id.* at 697 (citing *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied)). "The covenant cannot be a stand-alone promise from the employee lacking any new consideration from the employer." *Id.* (quoting *Sheshunoff*, 209 S.W.3d at 651). In *Powerhouse Productions*, Eric Scott went to work for Howard Gibson, Jr., in 1993. When he began his employment, he signed a seven year employment agreement containing a covenant not to compete. *Id.* at 694. In 1996 or 1997, Gibson incorporated and formed Powerhouse Productions, Inc., but did not require Scott to sign a new employment agreement. *Id.* Although the original agreement expired in 2000, Scott remained employed with Powerhouse, and the parties operated under the prior agreement. *Id.* In 2004, Scott entered into a new agreement with Powerhouse whereby Scott agreed not to compete with Powerhouse for a

five-year period should they sever their employment relationship. Scott and Powerhouse ended their relationship later that same year. *Id.* Scott went to work for a competitor, and Powerhouse sued him to enforce the 2004 covenant not to compete. The trial court and the Dallas Court of Appeals rejected Powerhouse's argument that confidential information and training provided to Scott before 2004 could serve as consideration for the 2004 covenant not to compete. *Id*. at 697-98. In doing so, the court reasoned that "past consideration is not competent consideration for contract formation." *Id*. at 697.

Powerhouse nevertheless argued that it provided Scott with training and confidential information after he signed the 2004 agreement, which created an enforceable unilateral contract of the type recognized by *Sheshunoff*. *Id.* at 697-98. Scott testified that he did not receive any new training or confidential information. *Id.* at 698. The trial court evaluated the conflicting evidence, concluded that Scott "was not given anything of value in exchange for signing the 2004 Agreement," and thus held that the agreement was not enforceable. *Id.* The court of appeals held that the trial court's conclusion was supported by legally and factually sufficient evidence, implicitly recognizing that Powerhouse was required to show that it actually provided confidential information in order to create the sort of unilateral contract discussed in *Sheshunoff*. *See id.*

**Discussion**

In this case, CCS asserted in its motion that it was entitled to partial summary judgment as a matter of law because Gorman's covenant not to compete became an enforceable unilateral contract after it provided him with confidential and proprietary information. CCS asserted further that Gorman violated the covenant when he became employed by Pinnergy. Gorman responded that CCS's promise to provide such information was illusory and unsupported by consideration because CCS never provided information that he did not already know from his prior employment with Mobley. Thus, Gorman contended, the information he received was past consideration and therefore could not satisfy the consideration requirement for the covenant not to compete.

*CCS's Summary Judgment Evidence*

In support of its motion for partial summary judgment, CCS presented excerpts from Gorman's testimony at the temporary injunction hearing. In this portion of his testimony,

6

Gorman admitted that he received confidential and proprietary financial information about the operation of CCS. In particular, Gorman testified as follows:

> [CCS's Counsel]: And this – this information that you were gathering was all information–it was confidential information about the company and its finances and its operation, right?
>
> [Gorman]: Yes. It wasn't common knowledge.
> . . . .
> [CCS's Counsel]: And in [the employment agreement], you acknowledge that in the course of your employment that you'll be provided with a [sic] confidential and proprietary information about your employer's business, right?
>
> [Gorman]: Yes.
>
> [CCS's Counsel]: And it – and, in fact, you – you acknowledged to me this morning indeed you had received that kind of information, right?
>
> [Gorman]: Financial statements, yes.
>
> [CCS's Counsel]: Confidential information, right?
>
> [Gorman]: Yes.

Later in his testimony, Gorman reaffirmed that he received confidential information as follows:

> [CCS's Counsel]: Mr. Gorman, you testified, and I want to be sure I understand this, that indeed you received confidential nonpublic information shortly after your [sic] began your employment with CCS; isn't that true?
>
> [Gorman]: Related to financial statements, income statements.
>
> [CCS's Counsel]: And that's confidential information, as defined in your Agreement, correct?
>
> [Gorman]: Yes.

Gorman also admitted that his knowledge of CCS financial statements and the disclosure of the information would give Pinnergy, his new employer, a competitive edge for about a month. CCS maintains that, by this testimony, it met its initial burden of showing that the covenant not to compete was enforceable as a matter of law. We agree. Accordingly, the burden then shifted to Gorman to raise a genuine issue of material fact that the covenant was unenforceable. CCS urges that Gorman failed to meet this burden.

*Gorman's Response*

In response to CCS's motion for partial summary judgment, Gorman presented the deposition testimony and the testimony at the temporary injunction hearing given by Robert Miracle, Mobley's general manager and Gorman's supervisor both at Mobley and CCS. Miracle testified that CCS acquired Mobley's assets and valuable employees because of their preexisting expertise in the "frac tank" and oilfield services trucking operation industry—knowledge that CCS generally lacked.[6]

Miracle testified in his deposition that CCS's financial statements detail its expenses, which are used to formulate bids to customers.[7] The expenses are divided into categories, namely, labor, maintenance, fuel, tires, depreciation, tools, and supplies. Each category of expense makes up a percentage of the total operating cost, which is then used to formulate the bid based on the acceptable profit margin. Miracle testified further that the specific confidential information CCS provided Gorman came from its financial statements, and particularly Gorman's knowledge of the percentages of each category of operating expenses in relation to the total cost used to formulate competitive bids, as well as the subsequent profit margin. The following colloquy occurred on that point:

---

[6] Miracle admitted in his testimony that CCS acquired Mobley for its expertise. More specifically, the following exchange occurred:

> [Gorman's counsel:] When CCS acquired Mobley, did the day-to-day operations change at all?
>
> [Miracle:] No.
>
> [Gorman's counsel:] Did business go on as usual?
>
> [Miracle:] Yes.
>
> [Gorman's counsel:] Is it fair to say that the – with CCS not having any experience in the trucking area of oil field services that the Longview office [formerly, Mobley] was really teaching Houston and Canada [CCS] about those operations?
>
> [Miracle:] That's a fair statement, yes.

Miracle also stated that CCS's operations at what used to be Mobley still consist mostly of the trucking and "frac" tank operations Mobley conducted.

[7] Miracle also testified that if CCS did not obtain a contract with a customer, it would have been because one of its competitors bid a lower price.

[Gorman's counsel:] As the general manager at the Longview office for CCS, did you ever provide any confidential, proprietary information to Mr. Gorman?

[Miracle:] Sure.

[Gorman's counsel:] What kind of information?

[Miracle:] Oh, how we allocated cost to bids, you know. He knew what our – what our percentages were on our expenses.

[Gorman's counsel:] Is this information that you conveyed to Mr. Gorman the same type of information that was conveyed to him when he was an employee of Mobley before the acquisition by CCS?

[Miracle:] Yeah. It's – I mean, it comes off the financial statements, yeah.

[Gorman's counsel:] Is it fair to say then that whatever confidential, proprietary information you were conveying to Mr. Gorman he already knew from his work under [Mobley]?

[Miracle:] That I did? Yes.

Miracle testified that the actual dollar amounts on the expenses fluctuated, but as a percentage of total cost, each expense category and the profit margin stayed the same. Illustrating this point is the following exchange between Miracle and Gorman's counsel:

[Gorman's counsel:] Financial statements, how often are financial statements generated?

[Miracle:] Monthly.

[Gorman's counsel:] All right. Use the April financial statement. Would that have been the last one that Mr. Gorman saw before leaving at the end of May?

[Miracle:] Yes.

[Gorman's counsel:] The information that's contained on that financial statement, your costs and expenses, your revenue, fluctuate month to month we agreed; right?

[Miracle:] The dollar figures, yes.

[Gorman's counsel:] Dollar figures. Right. Three months later, is the information on that financial statement still going to be useful to someone who knows that information?

[Miracle:] They could use that to figure out our percents of revenue to see how we operate as a percent of revenue. That doesn't change that much.

However, Miracle admitted that Gorman learned those percentages through his work at Mobley, but said he believed the information was "covered" by Gorman's covenant not to compete with CCS. Specifically, Miracle testified as follows:

9

[Gorman's counsel:] Without asking you what the percentages are, do you know whether the profit margin percentages have changed over the years since you've been in the [sic] oil field services [industry]?

[Miracle:] They've stayed fairly constant.

 . . . .

[Gorman's counsel:] Well, having signed one of these employment agreements yourself, including an agreement not to disclose information, do you believe that the information that Mr. Gorman acquired about profit margins while he was working for Mobley, before CCS took over, that that is confidential information that he cannot disclose to anyone?

[Miracle:] I would think it was, yes.

. . . .

[Gorman's counsel:] Well – okay. Just so I'm on the same page with you, make sure I'm right, that whatever knowledge or information that Mr. Gorman acquired about the oil field services industry working for [Mobley] you believe is included within the covenant not to compete and agreement not to disclose confidential, proprietary information . . . .

[Objection from CCS's counsel that "the document speaks for itself," which was never ruled upon by the trial court]

[Gorman's counsel:] Is that your understanding?

[Miracle:] That's my belief, yes.


*Additional Arguments*

On appeal, in further support of its argument that it provided Gorman confidential information, CCS points to alleged new accounting procedures and methods of depreciation. But CCS does not explain how these were new and different from the way Mobley operated or why the information was otherwise confidential.  CCS also contends that it acquired new disposal wells in the Barnett Shale in Fort Worth after purchasing Mobley, and that the financial statements, bid pricing, and costs used to formulate the bids were different from those used at Mobley.  However, Gorman attached to his response a portion of the testimony given by Miracle at the temporary injunction hearing, which undermines these arguments.

At the temporary injunction hearing, Miracle testified as follows:

[Gorman's Counsel:] [Y]ou told the Court that Mr. Gorman has access to certain confidential information including costs?

[Miracle:] Correct.

[Gorman's Counsel:] Allocation of costs to disposal wells, correct?

[Miracle:] Correct.

[Gorman's Counsel:] Equipment costs?

[Miracle:] Correct.

[Gorman's Counsel:] Customers?

[Miracle:] Correct.

[Gorman's Counsel:] Bid amounts?

[Miracle:] Correct.

[Gorman's Counsel:] Now, the fact of the matter is, Mr. Miracle, that that is done the exact same way it was done under Mobley, correct?

[Miracle:] Correct.

[Gorman's Counsel:] There's nothing new about CCS that has changed the way Mr. Gorman performed those duties, right?

[Miracle:] I don't understand your question. But nothing new –

[Gorman's Counsel:] When CCS bought the assets of Mobley and hired Mr. Gorman, --

[Miracle:] Correct.

[Gorman's Counsel:] – he continued to do his job at CCS, and later with Administaff, the same as he had done for Mobley?

[Miracle:] Yes.

[Gorman's Counsel:] He allocated the costs to disposal wells the same as he had for Mobley?

[Miracle:] Correct.

[Gorman's Counsel:] He saw the equipment costs the same as he had for Mobley; he saw customers the same as he had for Mobley, true?

[Miracle:] That's true.

[Gorman's Counsel:] He saw bid amounts the same as he did at Mobley?

[Miracle:] That's true.

[Gorman's Counsel:] And when these four disposal wells [in the Barnett Shale] up in the Fort Worth area were acquired by CCS, after Mr. Gorman started his employment at CCS, he may have worked on these particular four wells, but the truth of the matter, isn't it, Mr. Miracle, that CCS and Mobley operated saltwater disposal wells long before May – I'm sorry, before Mr. Gorman started at CCS?

[Miracle:] Yes.

11

[Gorman's Counsel:] The way he treated those disposal wells, as the controller for CCS, didn't change at all when these new four wells were acquired?

[Objection by CCS's counsel, the court asks for clarification by Gorman's counsel, but no ruling was obtained on the objection.]

[Gorman's Counsel:] I think you told us that after, I think the date is March 8th of 2007, when CCS purchased formally the assets, CCS acquired some saltwater disposal wells?

[Miracle:] That's right.

[Gorman's Counsel:] There were already saltwater disposal wells being operated by Mobley, right?

[Miracle:] Right.

[Gorman's Counsel:] And when CCS acquired these new wells, it really only added to the number of wells that Mr. Gorman was having to do financials for; it didn't add to the way he handle[d] those wells or treated those well[s] as controller, did it?

[Miracle:] No.

[Gorman's Counsel:] Everything remained the same as it had with Mobley?

[Miracle:] I'd agree, yeah.

### *Conclusion*

Although not conclusive in favor of Gorman, Miracle's testimony, viewed in the light most favorable to Gorman, shows that each expense as a percentage of total operating cost and the subsequent profit margin are the confidential portions of the financial statement, those percentages were consistent over time (including the period before CCS acquired Mobley), and Gorman used this information for CCS in the same way he had used it for Mobley. This evidence raises a material fact issue regarding whether CCS gave consideration for the covenant not to compete. *See **Roark***, 813 S.W.2d at 496 (whether party gave past or present consideration for agreement is question of fact).

In summary, CCS asserts that the covenant not to compete is enforceable, and Gorman insists that it is not. Specifically, they disagree about whether the covenant not to compete is supported by past or present consideration. Based upon our review of Gorman's evidence, we conclude that reasonable jurors could differ in their conclusions about whether the alleged confidential information was already known by Gorman through his work at Mobley, and whether CCS ever provided the alleged confidential and proprietary information that it promised.

12

*See Powerhouse Prods.*, 260 S.W.3d at 697-98. Accordingly, we sustain this portion of Appellant's first issue.

Also as part of his first issue, Gorman contends that the trial court erred when it granted summary judgment in CCS's favor because fact issues remain on his affirmative defenses; specifically, duress, failure/lack of consideration, fraud in the inducement, and excuse. In the remaining portion of Gorman's first issue, he argues that once he signed the second employment agreement with Administaff on June 30, 2007, his employment with CCS ceased, and that the covenant would be enforceable only for the approximately four month period he worked directly for CCS. Since Gorman did not begin working for Pinnergy until June 1, 2008, he contends he did not violate the covenant's terms. In his second issue, Gorman argues that the trial court ordered the incorrect rate of postjudgment interest. CCS joins Gorman in this issue. We need not address these remaining issues, because to do so would entitle Gorman to no greater relief than he has already obtained by our holding that he raised a fact issue on the enforceability of the covenant not to compete. *See* TEX. R. APP. P. 47.1.

If a summary judgment is reversed and remanded, as in the instant case, the parties are not necessarily limited to the theories asserted in the original summary judgment at a later trial on the merits. *Hudson v. Wakefield*, 711 S.W.2d 628, 631 (Tex. 1986); *Creative Thinking Sources, Inc. v. Creative Thinking, Inc.*, 74 S.W.3d 504, 511-12 (Tex. App.—Corpus Christi 2002, no pet.). This is because in a motion for summary judgment, as opposed to a full trial on the merits, the movant is not required to assert every theory upon which he may recover or defend. Thus, upon trial on remand, the movant may raise different theories than those reviewed on a previous appeal from a summary judgment. *Hudson*, 711 S.W.2d at 630-31. Because we have sustained a portion of Gorman's first issue and have not ruled on issues unnecessary to the final disposition of this appeal, the trial court has broad latitude in the proceedings on remand. *See* TEX. R. APP. P. 47.1; *see also Hudson*, 711 S.W.2d at 630-31.

We have held that Gorman raised a fact issue on the enforceability of the covenant not to compete. However, he has not proven that the covenant is unenforceable as a matter of law. In

any event, without a competing motion for summary judgment, we must remand the case rather than render judgment in Gorman's favor. *Morales v. Morales*, 195 S.W.3d 188, 192-93 (Tex. App.—San Antonio 2006, pet. denied) ("In general, the [court of appeals] is only entitled to render judgment in favor of the losing party in a summary judgment context if both parties move for summary judgment."). Accordingly, we *reverse* the judgment of the trial court and *remand* for further proceedings consistent with this opinion.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered April 29, 2011.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

14