NO. 12-09-00204-CV

 

IN THE COURT OF APPEALS          

 

TWELFTH COURT OF APPEALS DISTRICT

 

TYLER, TEXAS

CHAD GORMAN,                                         §                      APPEAL
FROM THE 

APPELLANT

                                                                        

V.                                                                    §                      COUNTY
COURT AT LAW #2 

 

CCS MIDSTREAM SERVICES, L.L.C.,

APPELLEE                                                   §                      GREGG
COUNTY, TEXAS







MEMORANDUM
OPINION

Chad
Gorman appeals the trial court’s grant of CCS Midstream Services, L.L.C.’s
motion for partial summary judgment.  Gorman raises two issues on appeal.  We
reverse and remand.

 

Background

Gorman
was employed as a controller at Mobley Oil Field Services LP (Mobley).  During
his employment with Mobley, Gorman never signed an employment agreement, and
his employment with Mobley was “at will.”  In 2007, Mobley’s owners sold its
assets to CCS Energy Services LLC, which subsequently became CCS Midstream
Services, L.L.C. (CCS).[1]  CCS is in the oilfield
services industry, which includes the transportation, management, and disposal
of oilfield fluids and liquids that are used or produced as waste in the
drilling, completion, and production of oil and gas wells.  Prior to CCS’s
acquisition of its assets, Mobley was engaged primarily in the trucking
operations aspect of the oilfield services industry, as well as owning and
operating “frac” tanks for hydraulic fracturing treatments in oil and gas
wells.  CCS, although experienced in providing oilfield services, lacked
expertise in the trucking and “frac” tank operations, which is the reason it
acquired Mobley’s assets.  

During
the acquisition of Mobley’s assets, CCS made offers of employment to some of
Mobley’s high level employees, including Gorman.  Among other things, the offer
of employment contained a covenant not to compete and mandated that Gorman
refrain from going to work for a competitor.[2]  The
duration of the covenant equaled the length of Gorman’s employment, not to
exceed two years. The covenant also provided that Gorman “acknowledges that in
the course of his  . . . employment with [CCS], [CCS] will provide [Gorman]
with confidential and proprietary information and/or specialized training
concerning [CCS’s] business.”

Gorman
signed the agreement on March 8, 2007, and began working for CCS.  According to
Gorman, CCS immediately began diminishing his job responsibilities.  On June
30, 2007, CCS hired Administaff Companies II, L.P. (Administaff) to administer
its payroll, employee benefits, and other related functions.  To that end,
employees of CCS, including Gorman, signed separate employment agreements with
Administaff.[3] 
Over time, Gorman’s satisfaction with his employment decreased due to his
diminished role.  In February 2008, Gorman began looking for other employment
and contacted Steve Nations at Pinnergy, Ltd. (Pinnergy), a direct competitor
with CCS.[4] 
After meeting with Nations and other executives at Pinnergy, Gorman ultimately
accepted employment at Pinnergy, and resigned from CCS and Administaff on May
30, 2008.  CCS sent Gorman a letter dated June 10, 2008, in which it reminded
Gorman of his responsibility to comply with the covenant not to compete.  CCS
discovered that Gorman began working for Pinnergy in what it believed to be a
capacity similar to his position with CCS.  Consequently, CCS filed suit
against Gorman to enforce the covenant not to compete.  In its petition, CCS
sought a temporary restraining order, a temporary injunction, and a permanent
injunction barring Gorman from continuing his employment with Pinnergy.  CCS
also sought to recover damages and attorney’s fees.

The
trial court issued an ex parte temporary restraining order (TRO) on July 11,
2008, and later extended the TRO until it made its ruling on the temporary
injunction.  The trial court held a temporary injunction hearing on July 17,
2008, during which it heard testimony from Gorman and Robert Miracle, the
general manager and Gorman’s supervisor at Mobley, and later, at CCS.  On
August 5, 2008, the trial court issued a temporary injunction.  Based on the
evidence and testimony adduced at the temporary injunction hearing, CCS filed a
motion for partial summary judgment, asserting that the covenant not to compete
was enforceable as a matter of law and that Gorman had violated the covenant. 
Miracle gave an oral deposition on October 6, 2008.  Gorman obtained leave to
file a response to the motion for partial summary judgment, and included Miracle’s
oral deposition as evidence.  The trial court ultimately granted CCS’s motion
for partial summary judgment.  No other issues remained after a subsequent
hearing on attorney’s fees, and the trial court issued its “Amended Final
Judgment for Permanent Injunction and Attorney[’s] Fees” on April 7, 2009.  The
trial court awarded CCS attorney’s fees in the amount of $37,279.50[5] and postjudgment interest at
the rate of 6%.  Gorman appealed. 

 

Covenant Not to Compete

            In
his first issue, Gorman asserts that the trial court erred in granting summary
judgment on CCS’s breach of employment contract claim because the covenant not
to compete in the employment contract is unenforceable as a matter of law, or
alternatively because he complied with the covenant. 

Standard
of Review

In
a traditional motion for summary judgment, if the movant’s motion and summary
judgment evidence facially establish the movant’s right to judgment as a matter
of law, the burden shifts to the nonmovant to raise a genuine issue of material
fact sufficient to defeat summary judgment.  M.D. Anderson Hosp. &
Tumor Inst. v. Willrich, 28 S.W.3d 22, 23 (Tex. 2000).  The evidence
raises a genuine issue of material fact if reasonable and fair-minded jurors
could differ in their conclusions in light of all of the summary judgment
evidence.  Goodyear Tire & Rubber Co. v. Mayes, 236 S.W.3d
754, 755 (Tex. 2007).

Summary
judgment is a question of law, and we therefore review a trial court’s summary
judgment decision de novo.  Mann Frankfort Stein & Lipp Advisors,
Inc. v. Fielding, 289 S.W.3d 844, 848 (Tex. 2009).  The standard of
review for a traditional summary judgment motion is threefold: (1) the movant
must show that there is no genuine issue of material fact and that he is
entitled to judgment as a matter of law; (2) in deciding whether there is a
disputed material fact issue precluding summary judgment, the court must take
evidence favorable to the nonmovant as true; and (3) the court must indulge
every reasonable inference in favor of the nonmovant and resolve any doubts in
the nonmovant’s favor.  Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d
546, 548-49 (Tex. 1985); see Tex.
R. Civ. P. 166a(c).  

Whether
a covenant not to compete is enforceable is a question of law for the court.  Fielding,
289 S.W.3d at 848.  Likewise, what constitutes sufficient consideration for a
contract is generally a question of law, but can be a question of fact.  Burges
v. Mosley, 304 S.W.3d 623, 629 (Tex. App.—Tyler 2010, no pet.)
(question of law); Roark v. Stallworth Oil and Gas, Inc., 813
S.W.2d 492, 496 (Tex. 1991) (holding factual questions remained on
consideration issue in summary judgment case due to failure to produce
conclusive proof). 

Applicable
Law

A
covenant not to compete is enforceable if it is (1) ancillary to or part of an
otherwise enforceable agreement at the time the agreement is made and (2)
reasonable, not imposing a greater restraint than is necessary to protect the
goodwill or other business interest of the employer.  Tex. Bus. & Com. Code Ann. § 15.50(a) (Vernon 2011).  The
first element can be broken down into two inquiries: (1) is there an “otherwise
enforceable agreement,” and (2) was the covenant not to compete “ancillary to
or part of” that agreement at the time the otherwise enforceable agreement was
made.  Fielding, 289 S.W.3d at 849. With regard to the first
inquiry, “otherwise enforceable agreements” can emanate from at-will employment
so long as the consideration for any promise is not illusory.  Id.  As
to the second inquiry, for a covenant not to compete to be “ancillary to or
part of” an otherwise enforceable agreement, the employer must establish both
“(1) that the consideration given by the employer in the otherwise enforceable
agreement [gives] rise to the employer’s interest in restraining the employee
from competing; and (2) that the covenant [was] designed to enforce the
employee's consideration or return promise in the otherwise enforceable
agreement.”  Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson, 209 S.W.3d
644, 649 (Tex. 2006).  Business goodwill and confidential or proprietary
information are examples of interests that can be, in appropriate
circumstances, worthy of protection by a covenant not to compete.  Id.
 However, for a covenant not to compete to be enforceable, the agreement must
be designed to enforce the return promises made by the employee.  Id.

Prior
to Sheshunoff, there was confusion about whether the employer’s
promise to provide confidential and proprietary information could create a
unilateral contract upon actual performance of that promise by the employer.  Sheshunoff
answered that question in the affirmative.  See id. at 651.  In Fielding,
the Texas Supreme Court clarified its holding in Sheshunoff as
follows:

 

In Sheshunoff, an employee signed an
at-will employment agreement containing a covenant not to compete. In the
agreement, the employer promised to provide the employee access to confidential
information and the employee promised not to disclose such information.  The
employer then gave the employee access to confidential information throughout
his employment. We followed and confirmed our analysis in Light,
with the exception of Light’s footnote six.  We concluded that
under section 15.50, a covenant not to compete is not invalid simply because
the otherwise enforceable agreement to which the covenant is ancillary is not
enforceable at the time the agreement is made. Rather, the covenant not to
compete need only be “ancillary to or part of” the agreement at the time the
agreement is made.  Thus, the requirement that there be an “otherwise
enforceable agreement” can be satisfied by the employer actually performing its
illusory promise to provide an employee with confidential information. 

 

 

Fielding,
289 S.W.3d at 849-50 (internal citations omitted).

However,
for a covenant not to compete to be enforceable, it must still be supported by
consideration.  Powerhouse Prods., Inc. v. Scott, 260 S.W.3d 693,
696 (Tex. App.—Dallas 2008, no pet.) (citing Sheshunoff, 209
S.W.3d at 651).  Past consideration is insufficient.  Id. at 697
(citing Trilogy Software, Inc. v. Callidus Software, Inc., 143
S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied)).  “The covenant cannot be
a stand-alone promise from the employee lacking any new consideration from the
employer.”  Id. (quoting Sheshunoff, 209 S.W.3d at
651).  In Powerhouse Productions, Eric Scott went to work for
Howard Gibson, Jr., in 1993. When he began his employment, he signed a seven
year employment agreement containing a covenant not to compete.  Id.
at 694.  In 1996 or 1997, Gibson incorporated and formed Powerhouse
Productions, Inc., but did not require Scott to sign a new employment
agreement.  Id.  Although the original agreement expired in 2000,
Scott remained employed with Powerhouse, and the parties operated under the
prior agreement.  Id.  In 2004, Scott entered into a new
agreement with Powerhouse whereby Scott agreed not to compete with Powerhouse
for a five-year period should they sever their employment relationship. Scott
and Powerhouse ended their relationship later that same year.  Id.
 Scott went to work for a competitor, and Powerhouse sued him to enforce the
2004 covenant not to compete.  The trial court and the Dallas Court of Appeals
rejected Powerhouse’s argument that confidential information and training provided
to Scott before 2004 could serve as consideration for the 2004 covenant not to compete. 
Id. at 697-98.  In doing so, the court reasoned that “past
consideration is not competent consideration for contract formation.”  Id.
at 697.  

Powerhouse
nevertheless argued that it provided Scott with training and confidential
information after he signed the 2004 agreement, which created an enforceable
unilateral contract of the type recognized by Sheshunoff.  Id.
at 697-98.  Scott testified that he did not receive any new training or
confidential information.  Id. at 698.  The trial
court evaluated the conflicting evidence, concluded that Scott “was not given
anything of value in exchange for signing the 2004 Agreement,” and thus held
that the agreement was not enforceable.  Id.  The court of
appeals held that the trial court’s conclusion was supported by legally and
factually sufficient evidence, implicitly recognizing that Powerhouse was
required to show that it actually provided confidential information in order to
create the sort of unilateral contract discussed in Sheshunoff.  See
id. 

Discussion


In
this case, CCS asserted in its motion that it was entitled to partial summary
judgment as a matter of law because Gorman’s covenant not to compete became an
enforceable unilateral contract after it provided him with confidential and
proprietary information.  CCS asserted further that Gorman violated the
covenant when he became employed by Pinnergy.  Gorman responded that CCS’s
promise to provide such information was illusory and unsupported by
consideration because CCS never provided information that he did not already
know from his prior employment with Mobley.  Thus, Gorman contended, the
information he received was past consideration and therefore could not satisfy
the consideration requirement for the covenant not to compete. 

            CCS’s
Summary Judgment Evidence

In
support of its motion for partial summary judgment, CCS presented excerpts from
Gorman’s testimony at the temporary injunction hearing.  In this portion of his
testimony, Gorman admitted that he received confidential and proprietary
financial information about the operation of CCS.  In particular, Gorman
testified as follows:

                                                                                               

                [CCS’s Counsel]: And this – this information that you were gathering
was all information–it was confidential information about the company and its
finances and its operation, right?

 

                [Gorman]:
 Yes.  It wasn’t common knowledge.

                . . . .

 

                [CCS’s Counsel]: And in [the
employment agreement], you acknowledge that in the course of your employment
that you’ll be provided with a [sic] confidential and proprietary information
about your employer’s business, right?

 

                [Gorman]:
 Yes.

 

            [CCS’s Counsel]: And it – and, in fact, you – you
acknowledged to me this morning indeed you had received that kind of
information, right?

 

                [Gorman]:
Financial statements, yes.

 

            [CCS’s Counsel]: Confidential information, right?

 

            [Gorman]: Yes.

 

 

Later in his testimony, Gorman
reaffirmed that he received confidential information as follows:

 

            [CCS’s Counsel]: Mr. Gorman, you testified, and I want
to be sure I understand this, that indeed you received confidential nonpublic
information shortly after your [sic] began your employment with CCS; isn’t that
true?

 

                        [Gorman]: Related to financial statements, income
statements.

 

                        [CCS’s Counsel]: And that’s confidential information,
as defined in your Agreement, correct?

 

                                [Gorman]:
Yes.

 

Gorman also admitted
that his knowledge of CCS financial statements and the disclosure of the
information would give Pinnergy, his new employer, a competitive edge for about
a month.    CCS maintains that, by this testimony, it met its initial burden of
showing that the covenant not to compete was enforceable as a matter of law.  We
agree.  Accordingly, the burden then shifted to Gorman to raise a genuine issue
of material fact that the covenant was unenforceable.  CCS urges that Gorman
failed to meet this burden.

 

            Gorman’s
Response

In
response to CCS’s motion for partial summary judgment, Gorman presented the
deposition testimony and the testimony at the temporary injunction hearing
given by Robert Miracle, Mobley’s general manager and Gorman’s supervisor both
at Mobley and CCS.  Miracle testified that CCS acquired Mobley’s assets and
valuable employees because of their preexisting expertise in the “frac tank”
and oilfield services trucking operation industry—knowledge that CCS generally lacked.[6]  

Miracle
testified in his deposition that CCS’s financial statements detail its
expenses, which are used to formulate bids to customers.[7] 
The expenses are divided into categories, namely, labor, maintenance, fuel,
tires, depreciation, tools, and supplies.  Each category of expense makes up a
percentage of the total operating cost, which is then used to formulate the bid
based on the acceptable profit margin.  Miracle testified further that the
specific confidential information CCS provided Gorman came from its financial
statements, and particularly Gorman’s knowledge of the percentages of each
category of operating expenses in relation to the total cost used to formulate
competitive bids, as well as the subsequent profit margin.  The following
colloquy occurred on that point:

 

            [Gorman’s counsel:] As the general manager at the
Longview office for CCS, did you ever provide any confidential, proprietary
information to Mr. Gorman?

 

[Miracle:] Sure.

 

                [Gorman’s counsel:] What kind of
information?

 

                [Miracle:] Oh, how we allocated cost
to bids, you know. He knew what our – what our percentages were on our
expenses.

 

                [Gorman’s counsel:] Is this information
that you conveyed to Mr. Gorman the same type of information that was conveyed
to him when he was an employee of Mobley before the acquisition by CCS?

 

[Miracle:] Yeah. It’s – I mean, it comes off the
financial statements, yeah.

 

                [Gorman’s counsel:] Is it fair to say
then that whatever confidential, proprietary information you were conveying to
Mr. Gorman he already knew from his work under [Mobley]? 

 

                [Miracle:] That I did? Yes.

 

 

Miracle
testified that the actual dollar amounts on the expenses fluctuated, but as a
percentage of total cost, each expense category and the profit margin stayed
the same.  Illustrating this point is the following exchange between Miracle
and Gorman’s counsel:

 

                [Gorman’s counsel:] Financial
statements, how often are financial statements generated?

 

                [Miracle:] Monthly.

 

                [Gorman’s counsel:] All right. Use the
April financial statement. Would that have been the last one that Mr. Gorman
saw before leaving at the end of May?

 

                                [Miracle:]
Yes.

 

                [Gorman’s counsel:] The information
that’s contained on that financial statement, your costs and expenses, your
revenue, fluctuate month to month we agreed; right?

 

                                [Miracle:]
The dollar figures, yes.

                

[Gorman’s counsel:] Dollar figures. Right. Three
months later, is the information on that financial statement still going to be
useful to someone who knows that information?

 

                [Miracle:] They could use that to
figure out our percents of revenue to see how we operate as a percent of
revenue. That doesn’t change that much. 

 

 

However,
Miracle admitted that Gorman learned those percentages through his work at
Mobley, but said he believed the information was “covered” by Gorman’s covenant
not to compete with CCS. Specifically, Miracle testified as follows:

 

                [Gorman’s counsel:] Without asking you
what the percentages are, do you know whether the profit margin percentages
have changed over the years since you’ve been in the [sic] oil field services
[industry]?

 

                                [Miracle:]
They’ve stayed fairly constant.

 . . . . 

 

[Gorman’s counsel:] Well, having signed one of these
employment agreements yourself, including an agreement not to disclose
information, do you believe that the information that Mr. Gorman acquired about
profit margins while he was working for Mobley, before CCS took over, that that
is confidential information that he cannot disclose to anyone?

 

[Miracle:] I would think it was, yes.

. .
. . 

 

[Gorman’s counsel:] Well – okay. Just so I’m on the
same page with you, make sure I’m right, that whatever knowledge or information
that Mr. Gorman acquired about the oil field services industry working for
[Mobley] you believe is included within the covenant not to compete and
agreement not to disclose confidential, proprietary information . . . . 

 

                [Objection from CCS’s counsel that “the
document speaks for itself,” which was never ruled upon by the trial court]

 

                [Gorman’s counsel:] Is that your
understanding?

 

                [Miracle:] That’s my belief, yes.

 

 

Additional
Arguments 

On
appeal, in further support of its argument that it provided Gorman confidential
information, CCS points to alleged new accounting procedures and methods of
depreciation. But CCS does not explain how these were new and different from the
way Mobley operated or why the information was otherwise confidential.  CCS
also contends that it acquired new disposal wells in the Barnett Shale in Fort
Worth after purchasing Mobley, and that the financial statements, bid pricing,
and costs used to formulate the bids were different from those used at Mobley. 
However, Gorman attached to his response a portion of the testimony given by
Miracle at the temporary injunction hearing, which undermines these arguments.

At
the temporary injunction hearing, Miracle testified as follows:

 

                [Gorman’s Counsel:] [Y]ou told the
Court that Mr. Gorman has access to certain confidential information including
costs?

 

[Miracle:] Correct.

 

                [Gorman’s Counsel:] Allocation of
costs to disposal wells, correct?

 

                [Miracle:] Correct.

 

                [Gorman’s Counsel:] Equipment costs?

 

                [Miracle:] Correct.

 

                [Gorman’s Counsel:] Customers?

 

                [Miracle:] Correct.

 

                [Gorman’s Counsel:] Bid amounts?

 

                [Miracle:] Correct.

 

                [Gorman’s Counsel:] Now, the fact of
the matter is, Mr. Miracle, that that is done the exact same way it was done
under Mobley, correct?

 

                [Miracle:] Correct. 

 

                [Gorman’s Counsel:] There’s nothing
new about CCS that has changed the way Mr. Gorman performed those duties,
right?

 

                                [Miracle:]
I don’t understand your question. But nothing new –

 

                [Gorman’s Counsel:] When CCS bought
the assets of Mobley and hired Mr. Gorman, --

 

[Miracle:] Correct.

 

                [Gorman’s Counsel:] – he continued to
do his job at CCS, and later with Administaff, the same as he had done for
Mobley?

 

                                [Miracle:]
Yes.

 

                [Gorman’s Counsel:] He allocated the
costs to disposal wells the same as he had for Mobley?

 

                [Miracle:] Correct.

 

                [Gorman’s Counsel:] He saw the
equipment costs the same as he had for Mobley; he saw customers the same as he
had for Mobley, true?

 

                                [Miracle:]
That’s true.

 

                                [Gorman’s
Counsel:] He saw bid amounts the same as he did at Mobley?

 

                                [Miracle:]
That’s true.

 

                [Gorman’s Counsel:] And when these
four disposal wells [in the Barnett Shale] up in the Fort Worth area were
acquired by CCS, after Mr. Gorman started his employment at CCS, he may have
worked on these particular four wells, but the truth of the matter, isn’t it,
Mr. Miracle, that CCS and Mobley operated saltwater disposal wells long before
May – I’m sorry, before Mr. Gorman started at CCS?

 

                                [Miracle:]
Yes.

 

                [Gorman’s Counsel:] The way he treated
those disposal wells, as the controller for CCS, didn’t change at all when
these new four wells were acquired?

 

[Objection by CCS’s counsel, the court asks for
clarification by Gorman’s counsel, but no ruling was obtained on the
objection.]

 

                [Gorman’s Counsel:] I think you told
us that after, I think the date is March 8th of 2007, when CCS purchased
formally the assets, CCS acquired some saltwater disposal wells?

 

                [Miracle:] That’s right.

 

                [Gorman’s Counsel:] There were already
saltwater disposal wells being operated by Mobley, right?

 

                [Miracle:] Right.

 

                [Gorman’s Counsel:] And when CCS
acquired these new wells, it really only added to the number of wells that Mr.
Gorman was having to do financials for; it didn’t add to the way he handle[d]
those wells or treated those well[s] as controller, did it?

 

[Miracle:] No.

 

                [Gorman’s Counsel:] Everything
remained the same as it had with Mobley?

 

                [Miracle:] I’d agree, yeah.

 

 

            Conclusion

Although
not conclusive in favor of Gorman, Miracle’s testimony, viewed in the light
most favorable to Gorman, shows that each expense as a percentage of total
operating cost and the subsequent profit margin are the confidential portions
of the financial statement, those percentages were consistent over time
(including the period before CCS acquired Mobley), and Gorman used this
information for CCS in the same way he had used it for Mobley.  This evidence
raises a material fact issue regarding whether CCS gave consideration for the
covenant not to compete.  See Roark, 813 S.W.2d at 496 (whether
party gave past or present consideration for agreement is question of fact).  

In
summary, CCS asserts that the covenant not to compete is enforceable, and
Gorman insists that it is not.  Specifically, they disagree about whether the
covenant not to compete is supported by past or present consideration.  Based
upon our review of Gorman’s evidence, we conclude that reasonable jurors could
differ in their conclusions about whether the alleged confidential information
was already known by Gorman through his work at Mobley, and whether CCS ever
provided the alleged confidential and proprietary information that it promised. 
See Powerhouse Prods., 260 S.W.3d at 697-98.  Accordingly,
we sustain this portion of Appellant’s first issue.

 

Remaining Issues

Also
as part of his first issue, Gorman contends that the trial court erred when it
granted summary judgment in CCS’s favor because fact issues remain on his
affirmative defenses; specifically, duress, failure/lack of consideration,
fraud in the inducement, and excuse.  In the remaining portion of Gorman’s
first issue, he argues that once he signed the second employment agreement with
Administaff on June 30, 2007, his employment with CCS ceased, and that the
covenant would be enforceable only for the approximately four month period he
worked directly for CCS.  Since Gorman did not begin working for Pinnergy until
June 1, 2008, he contends he did not violate the covenant’s terms.  In his
second issue, Gorman argues that the trial court ordered the incorrect rate of
postjudgment interest.  CCS joins Gorman in this issue.  We need not address these
remaining issues, because to do so would entitle Gorman to no greater relief
than he has already obtained by our holding that he raised a fact issue on the
enforceability of the covenant not to compete.  See Tex. R. App. P. 47.1.

If
a summary judgment is reversed and remanded, as in the instant case, the
parties are not necessarily limited to the theories asserted in the original
summary judgment at a later trial on the merits.  Hudson v. Wakefield,
711 S.W.2d 628, 631 (Tex. 1986); Creative Thinking Sources, Inc. v.
Creative Thinking, Inc., 74 S.W.3d 504, 511-12 (Tex. App.—Corpus
Christi 2002, no pet.).  This is because in a motion for summary judgment, as
opposed to a full trial on the merits, the movant is not required to assert
every theory upon which he may recover or defend.  Thus, upon trial on remand,
the movant may raise different theories than those reviewed on a previous
appeal from a summary judgment.  Hudson, 711 S.W.2d at 630-31.  Because
we have sustained a portion of Gorman’s first issue and have not ruled on
issues unnecessary to the final disposition of this appeal, the trial court has
broad latitude in the proceedings on remand.  See Tex. R. App.
P. 47.1; see also Hudson, 711 S.W.2d at 630-31.

 

Disposition

We
have held that Gorman raised a fact issue on the enforceability of the covenant
not to compete.  However, he has not proven that the covenant is unenforceable
as a matter of law.  In any event, without a competing motion for summary
judgment, we must remand the case rather than render judgment in Gorman’s
favor.  Morales v. Morales, 195 S.W.3d 188, 192-93 (Tex. App.—San
Antonio 2006, pet. denied) (“In general, the [court of appeals] is only
entitled to render judgment in favor of the losing party in a summary judgment
context if both parties move for summary judgment.”).  Accordingly, we reverse
the judgment of the trial court and remand for further
proceedings consistent with this opinion. 

 

 

                                                                   James
T. Worthen

                                                                                             
Chief Justice

 

 

Opinion delivered April 29, 2011.

Panel consisted of
Worthen, C.J., Griffith, J., and Hoyle, J.

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

(PUBLISH)









[1] The exact date of this change is
unclear in the record.  For ease of reference, both CCS entities are referred
to as CCS in this opinion. 

 





[2] Although there was no express
statement in the agreement, Mobley employees generally assumed that they were
required to sign the agreement to maintain their employment with CCS.

 





[3] Gorman’s employment agreement
with Administaff purported to create a dual employment relationship in which
Gorman was employed by both CCS and Administaff.  The Administaff agreement
stated that it did not alter the existing employment agreement between CCS and
Gorman and that termination of the Administaff agreement was not necessarily
termination of the CCS agreement. 

 





[4] It is undisputed that Pinnergy is a
CCS competitor.  

 





[5] Gorman does not challenge the
award of attorney’s fees in this appeal.





[6] Miracle admitted in his testimony that CCS acquired
Mobley for its expertise. More specifically, the following exchange occurred: 

 

[Gorman’s counsel:] When CCS acquired Mobley, did the
day-to-day operations change at all?

 

                                [Miracle:]
No.

 

                        [Gorman’s
counsel:] Did business go on as usual?

 

                                [Miracle:]
Yes.

 

            [Gorman’s counsel:] Is it fair to say that the – with
CCS not having any experience in the trucking area of oil field services that
the Longview office [formerly, Mobley] was really teaching Houston and Canada
[CCS] about those operations?

 

                        [Miracle:]
That’s a fair statement, yes. 

 

Miracle
also stated that CCS’s operations at what used to be Mobley still consist
mostly of the trucking and “frac” tank operations Mobley conducted. 





 

[7] Miracle also testified that if
CCS did not obtain a contract with a customer, it would have been because one
of its competitors bid a lower price.