# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00560-CV

---

**Citizens, Inc.; CICA Life Ltd.; and CICA Life Insurance Company of America, Appellants**

**v.**

**Randall H. Riley; Citizens American Life, LLC; and Citizens American Life, Inc., Appellees**

---

### FROM THE 419TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-18-006739, THE HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

This is an interlocutory appeal from the trial court's denial of an application for a temporary injunction. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(4) (permitting interlocutory appeal of order that refuses temporary injunction). Appellee Randall H. Riley worked for appellants Citizens, Inc.; CICA Life Ltd.; and CICA Life Insurance Company of America (collectively, "CICA")[1] as a marketing executive focused on selling life insurance policies to foreign nationals. CICA terminated his employment in 2015, after which Riley took steps to found his own insurance company by creating appellees Citizens American Life, LLC, and Citizens American Life, Inc. (collectively, CALI). CICA sued Riley and CALI for unfair competition, tortious interference with a contract, and misappropriation of trade secrets. CICA

---

[1] Citizens, Inc., is the parent company of CICA Life Ltd. and CICA Life Insurance Company of America.

applied for a temporary injunction to prevent appellees from engaging in a host of activities that CICA alleges continue to cause it irreparable harm, including selling any insurance product or policy. The district court denied the application. CICA contends that the district court abused its discretion by denying the application. We will affirm.

## BACKGROUND

In 1969, Riley's father, Harold Riley, founded CICA, a life insurance company that earned most of its revenue by selling life insurance policies to foreign nationals. Harold hired Riley in 1987 as an employee of CICA Life Ltd. to develop a marketing structure in Chile. Riley lived in Chile for about three years while developing a marketing program. Riley testified that his father wanted him to learn Spanish and learn about Latin American cultures so that he could more effectively interact with the independent consultants CICA contracted with to sell its insurance policies. Both Riley and his father befriended many of the independent consultants who contracted with their company. Riley returned to the United States in 1991 to become the international marketing director and served in that role until 1997. As part of his job, Riley helped revise CICA's policies based on comparisons between the policies CICA offered and the policies, pricing, and other materials he reviewed from other companies. In 1997, Riley resigned. He returned to CICA in 2006 and again served as international marketing director on the condition that he would not be involved in anything "but international marketing." Riley testified that in 2014, he heard that CICA's executives were discussing "pulling the company out of the international market." He stated that he "didn't take it to heart because it was, I think, they testified 70-75 percent of the business." However, as the conversations about CICA leaving the international market continued, Riley learned that CICA had failed to report taxable income and

2

might become bankrupt, meaning that they would no longer be operating in the international market. Riley's father retired in June 2015. Riley was terminated in October 2015.

After his termination, Riley began planning to found a life insurance company of his own, and he created Citizens American Life, LLC and Citizens American Life, Inc. Riley explained that he chose names and symbols for these companies because it was "a continuance of what my father had done and created and what I had been a major part in, because of the success I had building the sales force." Riley also testified that CICA was "going to pull out of the market" in Latin America and that he believed his names would not cause confusion because CICA worked under the name "CICA Life, and we were Citizens American Life." Riley hired Jonathan Pollio, an actuary who had worked at CICA, to create actuarial information for CALI to use in developing its products. He also eventually recruited other former CICA employees and independent consultants to work with CALI. Riley used premium rates, dividends, cash values and other information from CICA's publicly available policies to develop his insurance products.

In October 2017, First Trinity Financial contacted Riley to express interest in having CALI assist First Trinity in developing an international marketing program. First Trinity purchased CALI, and Riley now oversees the marketing of First Trinity's products in Latin America. Riley testified that for a short period of time during "the changeover" "we had to continue operating as [CALI] until [First Trinity] could get their systems functioning so we could issue the policy in Trinity American." Riley now markets First Trinity's products through the entity International Marketing Group SA, LLC (IMG). IMG does not set premium rates, issue policies, handle policy applications, or develop actuary information. IMG's logo does not resemble those of CALI or CICA, which also has a new logo, even though CICA argues that any

3

logo similar to its old logo would continue to cause confusion among its customers because the old logo appears on insurance policies still in circulation.

In May 2018, CICA stopped accepting new policy applications in Brazil, which had been one of its highest producing countries and which CICA acknowledged would have a negative impact on its ability to retain independent consultants. As a result, Riley significantly expanded his independent consultant network in Brazil such that IMG "primarily" markets policies in Brazil, though it has also sold policies in Chile, Uruguay, Argentina, Venezuela, Colombia, and Ecuador.

In November 2018, CICA sued Riley, CALI, and former CICA independent consultants Alexis Enrique Delgado, Carlos Nalsen Landa, Enrique Pinzon Ruiz, Johan Emilio Mikuski Silva, and Esperanza Peralta De Delgado, who are all associated with a company called Los Raudales.[2] CICA sued Riley and CALI for unfair competition, tortious interference with a contract, and misappropriation of trade secrets. Riley and CALI moved to dismiss the appeal pursuant to the Texas Citizens Participation Act (TCPA). *See* Tex. Civ. Prac. & Rem. Code §§ 27.001-.011.[3] CICA responded to the TCPA motion, attaching over 900 pages of evidence to its response to support its prima facie case for each essential element of its claims. Following a hearing, the district court denied the TCPA motion to dismiss on April 11, 2019. CICA asserts that it had continued its investigation into CALI and Riley while the litigation was stayed in the

---

[2] CICA did not seek a temporary injunction against the Los Raudales defendants, and they are not parties to this appeal.

[3] The TCPA was amended in the 2019 legislative session, but those amendments do not apply to this lawsuit, which was filed before the amendments' effective date. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 11, 12, 2019 Tex. Gen. Laws 684, 687 (amendments to TCPA apply "only to an action filed on or after" September 1, 2019). Accordingly, this opinion refers to the version of the statute in effect before September 1, 2019.

district court by the pending TCPA motion and discovered that, at some point after January 2019, the defendants "had begun marketing and selling insurance products derived from [CICA's] trade secrets." On May 29, 2019, CICA filed an application for a temporary injunction, which incorporated by reference the evidence filed with its response to the TCPA motion. After a hearing at which additional exhibits were introduced, the district court denied the application. CICA appeals, asserting (1) the district court abused its discretion by denying the temporary injunction and (2) the district court abused its discretion by excluding Plaintiff's Exhibit 26 as hearsay at the hearing on the temporary injunction.

## ANALYSIS

**Exclusion of Exhibit 26**

We first address CICA's complaint that the district court should have admitted Plaintiff's Exhibit 26. We review a trial court's exclusion of evidence for an abuse of discretion. *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 161 (Tex. 2015). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to any guiding principles or rules. *See Enbridge Pipelines (E. Tex.) L.P. v. Avinger Timber, LLC*, 386 S.W.3d 256, 262 (Tex. 2012). Erroneous exclusion of evidence is reversible error only if it probably resulted in an improper judgment. Tex. R. App. P. 44.1(a)(1); *Garza*, 466 S.W.3d at 161; *State v. Central Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009) (stating that the "complaining party must only show 'that the exclusion of evidence probably resulted in the rendition of an improper judgment'" (quoting *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex. 1992) (internal citation omitted))). "[T]he exclusion . . . is likely harmless if the evidence was cumulative, or the rest of the evidence was so one-sided that the error likely made no difference in the judgment." *Central Expressway Sign*, 302 S.W.3d at 870. Whether the erroneous

5

exclusion of evidence probably caused the trial court to render an improper judgment is a "judgment call entrusted to the sound discretion and good sense of the reviewing court from an evaluation of the whole case." *First Emps. Ins. v. Skinner*, 646 S.W.2d 170, 172 (Tex. 1983). The district court excluded Exhibit 26, which CICA attempted to introduce during the testimony of its Vice President of Compliance, on the ground that it was hearsay. *See* Tex. R. Evid. 801, 802 (prohibiting the admission of out-of-court statements offered to prove their truth unless a hearsay exception applies). Exhibit 26 is an email from one of the Los Raudales defendants, Carlos Nalsen Landa (Nalsen), to Riley and Alexis Enrique Delgado (another Los Raudales defendant). The email compared information regarding yields from CICA's insurance plans to those of CALI. CICA first argues the Exhibit was not hearsay because it was not offered to show the truth of the matter asserted but was offered to show that Nalsen was providing information about CICA to Riley. CICA next argues that the email was admissible as a statement by an opposing party. *See id.* R. 801(e)(2)(A) (statement by party-opponent offered against that party is not hearsay); *see also Njowo v. Welling*, No. 01-17-00798-CV, 2018 Tex. App. LEXIS 6898, at *14 (Tex. App.—Houston [1st Dist.] August 28, 2018, no pet.) (mem. op.) ("While a party's out-of-court statements may be offered against the party who made them, this exclusion does not allow a litigant to offer the out-of-court statements made by one party against another party for the truth of the matter asserted, absent another exclusion from, or exception to, the hearsay rule.").

CICA does not explain how the exclusion of this email might have impacted the district court's decision to deny the application for a temporary injunction. We note that there are over 1,400 pages of other evidence, some of which show that CALI focused on gathering information about CICA in order to directly compete with CICA. For example, an email from

Riley himself explains that his goal is to learn as much about CICA as possible to develop "a product that is better than CICA's from all angles and points of view." He also wrote, "We have their product, so all we have to do is develop one that is superior." Another exhibit contains another email from Nalsen to Riley in which he presents a comparison between CICA's and CALI's premiums and commissions. Because CICA does not explain how exclusion of Exhibit 26 resulted in an improper ruling on its application for a temporary injunction, we overrule CICA's issue regarding the exclusion of Exhibit 26. *See Central Expressway Sign*, 302 S.W.3d at 870.

**Temporary Injunction**

A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993). The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The status quo is "the last actual, peaceable, non-contested status which preceded the pending controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (orig. proceeding) (quoting *Janus Films, Inc. v. City of Fort Worth*, 358 S.W.2d 589, 589 (Tex. 1962) (per curiam)). To obtain a temporary injunction, the applicant must ordinarily plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204. A probable injury is one that is imminent, irreparable, and has no adequate remedy at law. *Lavigne v. Holder*, 186 S.W.3d 625, 629 (Tex. App.—Fort Worth 2006, no pet.).

In an appeal from an order granting or denying a request for a temporary injunction, our review is confined to the validity of the order that grants or denies the injunctive

7

relief. *Synergy Ctr., Ltd. v. Lone Star Franchising, Inc.*, 63 S.W.3d 561, 564 (Tex. App.—Austin 2001, no pet.); *see Taylor Hous. Auth. v. Shorts*, 549 S.W.3d 865, 878 (Tex. App.—Austin 2018, no pet.) (stating that the appeal of a temporary injunction "does not present the merits of the underlying case for review, but only whether the trial court abused its discretion in determining whether or not the applicant is entitled to preservation of the status quo pending determination of those merits"). The decision to grant or deny an injunction is within the sound discretion of the trial court, and we will not reverse that decision absent a clear abuse of discretion. *Walling*, 863 S.W.2d at 57. A trial court abuses its discretion when it acts arbitrarily and unreasonably, without reference to guiding rules or principles, or when it misapplies the law to the established facts. *Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011) (citing *Mercedes-Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 666 (Tex. 1996)); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985). In deciding whether the trial court has abused its discretion in denying or granting a request for a temporary injunction, the reviewing court may neither substitute its judgment for that of the trial court nor consider the merits of the underlying lawsuit. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *Synergy Ctr., Ltd.*, 63 S.W.3d at 564. We must review the evidence in the light most favorable to the order and must indulge all reasonable inferences in favor of the trial court's decision. *Center for Econ. Justice v. American Ins.*, 39 S.W.3d 337, 344 (Tex. App.—Austin 2001, no pet.). "A trial court does not abuse its discretion if it heard conflicting evidence and evidence in the record reasonably supports the trial court's decision." *Shorts*, 549 S.W.3d at 878. In the absence of specific findings of fact and conclusions of law, the trial court's order must be upheld on any legal theory supported by the record. *Davis*, 571 S.W.2d at 862; *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 577 (Tex. App.—Austin 2000, no pet.).

8

CICA asserts the district court abused its discretion in denying its application for a temporary injunction because CICA showed it had (1) causes of action against CALI and Riley for unfair competition, tortious interference with a contract, and misappropriation of trade secrets; (2) a probable right to the relief sought for each of these claims; and (3) a probable, imminent, and irreparable injury as a result of each of these claims in the interim. CICA specifically urges that there can be no dispute that it pleaded and proved causes of action for unfair competition, tortious interference with a contract, and trade secret misappropriation against Riley and CALI "given that [CICA] defeated a motion to dismiss those very claims under the TCPA." In other words, CICA argues that "a party who defeats a TCPA motion to dismiss *a priori* has 'plead[ed] and prove[d]' the corresponding causes of action with clear and specific evidence." The "prima facie case" required to overcome dismissal under the TCPA "requires only the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Serafine v. Blunt*, 466 S.W.3d 352, 357 (Tex. App.—Austin 2015, no pet.) (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding) (internal quotation marks and citation omitted)). A prima facie case will entitle a party to recover only if no evidence to the contrary is offered by the opposite party. *Id.*; *cf. Kerlin v. Arias*, 274 S.W.3d 666, 668 (Tex. 2008) (per curiam) (explaining that summary-judgment movant's presentation of prima facie evidence of deed's validity established his right to summary judgment unless nonmovants presented evidence raising a fact issue related to validity). We further note that under the TCPA, "the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based," such that a party could establish its prima facie case based on its pleadings. Tex. Civ. Prac. & Rem. Code § 27.006(a) ("Evidence"). The standards for reviewing orders of dismissal under the

9

TCPA and decisions on applications for temporary injunctions differ substantially. As a result, the district court's decision to deny the TCPA motion does not bear on whether the district court abused its discretion in denying CICA's application for a temporary injunction.

### *Unfair Competition*

The basis of the tort of unfair competition is "a likelihood of consumer confusion as to the source of the goods." *John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.*, 17 S.W.3d 721, 735 (Tex. App.—Austin 2000, pet. denied) (citing *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 590-92 (5th Cir. 1993); *Pebble Beach Co. v. Tour 18 I*, 942 F. Supp. 1513, 1554 (S.D. Tex. 1996), *aff'd as modified*, 155 F.3d 526 (5th Cir. 1998)). "Unfair competition 'consists in the simulation by one person, for the purpose of deceiving the public, of the names, symbols, labels, or devices employed by a business rival, in order to induce the purchasing public to buy his products in the belief that they are those of his rival.'" *Id.* at 735 n.3 (quoting *Avnet v. Texas Centennial Cent. Exposition*, 96 S.W.2d 685, 687 (Tex. App.—Dallas 1936, writ dism'd w.o.j.) (internal quotations omitted)).

CICA sought to enjoin CALI and Riley from using any name or brand incorporating the word "Citizens" or "CICA" or using any logo confusingly similar to CICA's former logo, which included an etched globe. As evidence of this confusion, CICA introduced testimony that in a few instances, customers had sent premium payments to CALI instead of CICA for CICA policies. A CICA employee testified that "we had customers who were confused about the policy that they purchased with us and now are they making a premium payment to Citizens American or to our company, Citizens." He also testified that CICA lost independent consultants who were once producing business for CICA. However, additional

10

evidence showed that CICA's contracts and insurance policies contained at the tops of the documents the name "CICA Life Insurance Company of America." CICA's employee confirmed that CICA Life Insurance Company of America had novated all of its policies to "CICA Life" and that none of the policies issued by CICA Life contain the name "Citizens" in the title. No evidence in the record suggested that CALI had used "CICA" in its documents. Further, at the time of the hearing on the temporary injunction, Citizens American Life, Inc., had been purchased by First Trinity; Citizens American Life, LLC, was no longer being used for business purposes; and Riley was marketing First Trinity's products through IMG, which has a logo that does not resemble CICA's former globe logo nor CICA's current logo, which no longer includes a globe. On these facts, we conclude that CICA has not shown a probable, imminent, and irreparable injury in the interim between when it sought the injunction and when the claim for unfair competition is tried. *See Butnaru*, 84 S.W.3d at 204. Accordingly, the district court did not abuse its discretion in denying a temporary injunction to enjoin CICA and Riley from using the word "Citizens" or "CICA" in its name or using a logo involving a globe.

### Tortious Interference with a Contract

To recover for tortious interference with a contract, a plaintiff must prove: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was a proximate cause of the plaintiff's damages; and (4) actual damage or loss. *See Butnaru*, 84 S.W.3d at 207 (describing elements of a claim for tortious interference with a contract). CICA's claim for tortious interference alleges that CALI and Riley willfully and intentionally interfered with the contracts between CICA and the Los Raudales defendants to

11

breach the Los Raudales contracts.[4]  CICA sought to enjoin CALI and Riley from interfering with CICA's existing contracts with independent consultants and marketing firms by using CICA's confidential information or contacting the consultants or firms or attempting to divert those consultants or firms to any other insurance company or its affiliates.  CICA further sought to enjoin CALI and Riley from "communicat[ing] to any independent consultants or marketing firms who are known or believed by [CALI and Riley] to be in a contractual relationship with [CICA]."  CICA alleges that it was harmed by losing some of its valuable "independent consultant network."  CICA points to Nalsen's communications with CICA and Riley as its strongest evidence that appellees induced Nalsen to breach his contract, specifically, Nalsen's chart comparing the premiums and commissions for CALI's and CICA's products.  Riley testified that he did not actively or knowingly recruit independent consultants or marketing firms that had previously worked for CICA.  In addition, the evidence showed that CICA had been considering ending operations in foreign markets before Riley was terminated from CICA and that CICA ultimately ceased issuing policies in Brazil, one of CICA's "top-producing" countries, which CICA acknowledged would have a negative impact on its ability to retain independent consultants.  Riley testified that CICA had not properly paid income tax at some point after 2015, with the result that it owed "upwards of $80 million in back taxes," which might have caused some of the independent consultants to stop working with CICA.  Because the departure of independent consultants, including the Los Raudales defendants, and their corresponding customer bases may have resulted from CICA's tax issues, rumors of its plans to withdraw from the international market, or its actual withdrawal from Brazil, the district court could have

---

[4]  The parties' briefs mention that CICA has filed an amended petition while this appeal was pending.  That petition is not in the record.

12

determined that CICA did not establish that Riley and CALI proximately caused the Los Raudales defendants to leave CICA's network of consultants. Accordingly, the district could have concluded that, having failed to establish that appellees caused CICA's harm, CICA failed to demonstrate a probable right to the relief it sought. On these facts, we cannot conclude that the trial court abused its discretion in denying the request to enjoin CALI and Riley from communicating with any independent consultants or marketing firms they know or believe to be in a contractual relationship with CICA.

### *Misappropriation of Trade Secrets*

The elements of trade-secret misappropriation are: (1) the existence of a trade secret owned by the plaintiff; (2) breach of a confidential relationship or improper discovery of a trade secret; (3) "use" of the trade secret; and (4) injury. *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied). "A trade secret is any formula, pattern, device, or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Computer Assocs. Int'l v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996) (citing *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 776 (Tex. 1958) (quoting Restatement of Torts § 757 (1939))); *see* Restatement (Third) of Unfair Competition § 39 (1995). To determine whether a trade secret exists, Texas courts weigh six nonexclusive factors:

(1) the extent to which the information is known outside of the business;

(2) the extent to which it is known by employees and others involved in the business;

13

(3) the extent of the measures taken to guard the secrecy of the information;

(4) the value of the information to the business and its competitors;

(5) the amount of effort or money expended in developing the information; and

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (orig. proceeding) (citing Restatement of Torts § 757 cmt. b (1939); Restatement (Third) of Unfair Competition § 39 reporter's n. cmt. d (1995)). Because "trade secrets do not always neatly fit each of the factors," and because "other factors could also be relevant to trade secret analysis," courts should "weigh the factors in the context of the surrounding circumstances." *Id.* at 740. However, at the preliminary stage of deciding whether to grant a temporary injunction, a trial court does not determine whether or not a trade secret actually exists. *Center for Econ. Justice*, 39 S.W.3d at 343. Instead, "the trial court ascertains whether the applicant has established that the information is entitled to trade-secret protection until trial on the merits." *Id.* (citing *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 23 (Tex. App.—Houston [1st Dist.] 1998, no pet.)). "[A]n order granting trade-secret protection does not mean the protected information is in fact a trade secret." *Id.* (citing *Midland Bldg. & Loan Ass'n v. Sparks Chapel Colored M.E. Church*, 35 S.W.2d 774, 775 (Tex. App.—Dallas 1931, no writ)).

CICA sought to enjoin CALI and Riley from disclosing its trade secrets and from "selling any insurance product, policy, or interest in insurance that is based on, derived from, or utilizes, in whole or part" CICA's confidential information or trade secrets. For purposes of the injunction, CICA defined "confidential information and trade secrets" as:

14

all files, documents, email, technology, specifications, designs, processes, plans, intellectual property, and other materials or items (regardless of media, written, electronic or otherwise, and whether stored in local or central databases, on personal computers, in files or otherwise) of or developed or conceived by or for Plaintiffs, except for any documents or information available in the public domain that was not improperly placed in the public domain by any Defendant.

In addition to that broad definition, CICA also defined trade secrets for purposes of the injunction as "consist[ing] of":

[CICA's] commission tables;

[CICA's] "Persistence Study";

[CICA's] summary profit sheets, premium rates, and actuarial tables;

Customer lists or compilations of contact information of [CICA's] policyholders;

Lists of [CICA's] existing independent consultants or independent marketing networks; and

Any other materials created by [CICA] that [CALI and Riley] received in the course of their employment with [CICA] and that [CALI and Riley] were contractually bound to hold in confidence and to return to [CICA] upon the termination of their employment.

CICA emphasizes that Riley frequently emailed himself documents containing CICA's confidential information and trade secrets. Riley testified that he emailed himself these documents to ensure that he had access to them while traveling for his international marketing work for CICA, a practice that continued until he was unexpectedly terminated in October 2015. Riley further testified that he had never used some of the information alleged to be in his possession, such as the "anti-money laundering curriculum" that had been emailed to him by a

15

former CICA employee. Riley testified that much of the information, such as CICA's policies and commission tables were made available not only to CICA's independent consultants, but also to prospective consultants because they were included as part of a recruiting package that Riley used and which was given out without any requirement to maintain its confidentiality. The premium rates for CICA's policies are included in the policies that are sold to customers, meaning that both the policies and the premium rates have been released to the public. The evidence further showed that CICA's commission tables are available online. CICA also argued that an email from Nalsen included a list of sixty customers. *See Parker Barber & Beauty Supply, Inc. v. Wella Corp.*, No. 03-04-00623-CV, 2006 Tex. App. LEXIS 8841, at \*52 (Tex. App.—Austin Oct. 11, 2006, no pet.) (mem. op.) (explaining that "[w]hether a customer list should be considered a trade secret depends on the circumstances"); *Trilogy Software*, 143 S.W.3d at 466-67 (noting that trade secret status does not automatically attach to any information that a company acquires regarding its customers; "if it did, it would amount to a de facto common law non-compete prohibition"). In his testimony about that email, Riley testified that he received an email from Nalsen saying that a group of Venezuelan insureds had inquired about moving their policies to CALI. Riley stated that the email referenced the policies by face amount and date of issue, though he conceded that "[t]here might have been some names." Riley further stated that he declined the opportunity to move those policies to CALI. Riley also testified that, rather than using CICA's actuarial tables, he paid a former CICA employee, Pollio, to create actuarial information, which Pollio did over the course of two years, finishing the work after CALI was purchased by Trinity. Pollio had told Riley that Pollio did not have access to CICA's actuarial information.

16

Although the record contained conflicting evidence regarding whether some of CICA's information constituted trade secrets, CALI and Riley adduced evidence that, at least as to the categories of information discretely identified by CICA, much of the information was known extensively among employees and independent consultants for CICA, some information was available to customers through their polces, and some information was available online without any measures in place to guard its secrecy. Based on the evidence in the record, the district court could have determined that the information CICA sought to protect was not entitled to trade-secret protection until trial on the merits. We therefore conclude that the district court did not abuse its discretion in denying the temporary injunction based on CICA's claim for misappropriation of trade secrets.

## CONCLUSION

For the foregoing reasons, we affirm the district court's order denying CICA's application for injunctive relief.

_____

Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Triana and Smith

Affirmed

Filed:   August 31, 2020

17